# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2015-KA-01900-COA

**NICHOLAS DEMORST A/K/A NICHOLAS**
**MARCEL DEMORST A/K/A NICHOLAS M.**
**DEMORST A/K/A NICHOLAS DE MORST**
**A/K/A MARCEL DENEGAL A/K/A LA**

APPELLANT

v.

**STATE OF MISSISSIPPI**

APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 06/04/2015 |
| TRIAL JUDGE: | HON. DALE HARKEY |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| | PHILLIP BROADHEAD |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BARBARA WAKELAND BYRD |
| DISTRICT ATTORNEY: | ANTHONY N. LAWRENCE III |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF CAPITAL MURDER AND SENTENCED TO LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITHOUT ELIGIBILITY FOR EARLY RELEASE, EARNED CREDIT, OR PAROLE, AND TO PAY A $10,000 FINE AND $2,500 IN RESTITUTION |
| DISPOSITION: | AFFIRMED: 06/20/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE GRIFFIS, P.J., FAIR AND GREENLEE, JJ.**

**FAIR, J., FOR THE COURT:**

¶1.     Hunter Miller was shot and killed during a robbery attempt while trying to illegally

buy prescription narcotics from a friend of a friend (of a friend, of a friend).  Nicholas

Demorst was linked to the botched drug deal by phone records, and he was subsequently identified as the killer by the other participants in the abortive deal. Demorst was convicted of capital murder, and on appeal he contends he received constitutionally ineffective assistance of counsel and that the trial court committed plain error in allowing into evidence recordings of phone calls Demorst made from jail, as well as his identification as the shooter by the two eyewitnesses. We find no error and affirm.

**FACTS**

¶2.     Miller was addicted to prescription pain medication, and his supply had run out. On January 14, 2014, he encountered an acquaintance he knew to also be addicted to pain killers. Miller asked whether she knew someone who could sell him the particular pills he preferred, and the acquaintance put him in touch with her supplier, Kenneth Knox. Knox did not have the pills Miller wanted, but he said he would try to find them. Knox asked around, and his friend Freddie Lawrence put him in touch with another man, who Lawrence called "L.A." (the man identified himself to Knox as "T.T."). He had the pills and would sell them to Miller. For arranging the deal, Knox would be paid a small amount of marijuana (or, depending on the testimony, synthetic marijuana). Miller's friend, Collin Cooper, agreed to come along. A meeting was arranged, but the dealer did not show. Later that same day, however, the various parties to the deal resumed contact and agreed to meet near University Street in Gautier.

¶3.     Miller, Knox, and Cooper drove together to University Street around 8 p.m., when it

was dark outside. Between them, Miller and Cooper were holding more than a thousand dollars in cash for the purchase. They had difficulty locating the dealer, so Knox called him and was told the dealer was standing in front of one of the houses on University Street and that they had already passed him. They turned around and subsequently encountered an African-American man standing in front of a vehicle in a driveway on University Street. Knox saw the man while he was still speaking to him on the phone. Cooper later said he saw another man inside the vehicle, though Knox did not. The man standing outside told them to pull into the driveway, and Miller complied. Knox got out and spoke to the man, who asked whether they had the money and how many pills they wanted to buy. Knox asked to see the pills first, which prompted the man to draw a pistol. Knox warned Miller and Cooper that it was a robbery, and he fled on foot. The man attempted to take Miller's money as Miller put the vehicle into reverse and backed out of the driveway. The man pursued, and as Miller began driving forward, the man shot Miller through the driver's side window. Mortally wounded, Miller lost control of the vehicle, and it crashed into a fence. The shooter fled.

¶4.    Cooper got out of the vehicle and initially denied being present during the shooting. Cooper explained at trial that he had had prior run-ins with the law and was concerned that his involvement would lead to him being imprisoned. Eventually, both Cooper and Knox identified Demorst as the shooter. Knox testified at trial that he had previously met Demorst at some point in the past, but had not realized it at the time of the drug deal. Phone records

3

indicated that a cell phone in Demorst's name had been in frequent contact with Knox and Lawrence throughout the day of the murder, including calls with Knox moments before the shooting and numerous calls with Lawrence less than ten minutes later.[1] Phone records also corroborated Knox's testimony that Demorst had called him after the murder and warned him not to speak to the police.[2] Finally, the State introduced jailhouse recordings of phone calls involving Demorst from the week or so after he was arrested. In the recordings, Demorst appeared to rehearse an alibi defense with his girlfriend and suggested she pay a man to provide him with another alibi. Demorst also mentioned a large loss he had incurred shortly before being arrested, apparently from gambling, which he referred to as his "downfall."

¶5.　　Demorst did not testify at trial, but he did testify before the grand jury and gave an interview to police investigators, and these were entered into evidence at the trial. Demorst denied not only the murder, but the drug deal as well. Of the participants, Demorst claimed only to know Lawrence, and not well. Demorst claimed to have been with a mechanic or his

---

[1] The phone records show literally dozens of calls between Demorst and Knox and between Demorst and Lawrence on the day of the shooting. The last call prior to the shooting was made by Knox to Demorst at 8:15:33 p.m. and lasted 128 seconds. The shooting occurred shortly before 8:19:59, when the records indicate Knox called Miller. According to Knox, this call was made to check on Miller immediately after the shooting. At 8:27:31, Demorst called Lawrence, and the two exchanged numerous calls shortly thereafter.

[2] These calls were actually made from Lawrence's cell phone (with Lawrence initially speaking on the phone) and a cell phone belonging to Demorst's girlfriend's sister. This phone was also used to call Lawrence several times starting approximately thirty minutes after the shooting; from that point on Demorst did not call Lawrence from his own cell phone.

4

"friend girl" (who later became his girlfriend[3]) at the time of the murder. At trial, the defense produced the girlfriend's mother, who testified that she had seen Demorst at her home, some distance from the shooting, a short time before it happened. Demorst also claimed that he used a different cell phone from the one in his name that was linked to the deal, and – somewhat inconsistently – that his phone had been broken at the time.

¶6. Demorst was convicted of capital murder, and he appeals. Phillip W. Broadhead, clinical professor and director of the University of Mississippi School of Law Criminal Appeals Clinic, was appointed as Demorst's appellate counsel. Third-year law students under Professor Broadhead's supervision were appointed as special counsel pursuant to the Mississippi Law Student Limited Practice Rule. Darian R. Etienne and Reginald Lewis assisted in the preparation of Demorst's brief, and Kaeley N. Gemmill and William H. Holley presented oral argument.

## DISCUSSION

### 1. Witness Identifications – Plain Error

¶7. Demorst contends that the trial court committed plain error in failing to sua sponte suppress the in-court and out-of-court identifications of Demorst as the shooter by the two

---

[3] Demorst was somewhat inconsistent on this point; at times he suggested they had been together longer, "on and off." This was important because, when initially contacted by investigators, the girlfriend's family gave a false or incorrect name for Demorst, calling him "Marcel Denegal." Investigators found that one of the sisters was "friends" on Facebook with a "Marcel D," but she and another sister of the girlfriend denied knowing the man. The girlfriend's mother – who provided Demorst with an alibi – testified at trial that she met him for the first time the night of the murder.

5

eyewitnesses, Knox and Cooper, based on what Demorst contends were overly suggestive identification procedures. The record reflects that Demorst made no motion to suppress the identifications and no contemporaneous objections to the in-court identifications – in fact, Demorst was the one who brought out testimony regarding Knox's somewhat equivocal out-of-court identification of him. "[I]ssues not presented to the trial court for lack of contemporaneous objection are procedurally barred, and error, if any, is waived." *Goff v. State*, 14 So. 3d 625, 655 (¶118) (Miss. 2009) (citation omitted).

¶8. Demorst can proceed on this issue, if at all, only under a plain error standard, which our courts will allow "only in unusual circumstances" to "prevent[] a manifest miscarriage of justice." *Id.* (citation omitted). As the Mississippi Supreme Court has repeatedly explained, appellate courts will only find plain error in cases where "a defendant's substantive or fundamental rights are affected." *Willie v. State*, 204 So. 3d 1268, 1279 (¶29) (Miss. 2016) (citation omitted). More precisely, the appellant must show that the trial court deviated from a legal rule, that the error is plain, clear, or obvious, and that the error prejudiced the outcome of the trial. *Id.*

¶9. At the outset, we note that this issue is one particularly unsuited for plain error review – we are aware of no legal rule requiring a trial court to *sua sponte* suppress evidence. *See Shaheed v. State*, 205 So. 3d 1105, 1112 (¶21) (Miss. Ct. App. 2016). Furthermore, the admissibility of identification evidence is a complicated, fact-intensive issue – requiring fact finding and weighing of factors by the trial court. These findings can be made fairly only

6

after both sides have had advance notice and an opportunity to present their full case as to the admissibility of the identifications.

¶10. Objections to the admissibility of identification evidence should be made in a motion to suppress. *See United States v. Acox*, 595 F.3d 729, 733 (7th Cir. 2010). Motions to suppress evidence are generally required to be made in advance of trial, and the failure to do so without good cause has been held to be not only a procedural bar, but a waiver of the issue precluding even plain error review. *See id.* at 730-31; *Houston v. State*, 887 So. 2d 808, 812 (¶¶12-15) (Miss. Ct. App. 2004). The trial court in the instant case entered a scheduling order requiring motions to suppress to be filed by a certain date, in advance of trial, and Demorst did not file one.

¶11. Assuming for the sake of argument that the issue is still subject to plain error review, Demorst has failed to show plain error. As to Knox's identification, he was initially presented with a photo array showing six individuals, but Demorst was not one of them. Knox picked a man named Laterrance Adams, who was later determined to have been imprisoned at the time of the shooting. After Demorst was identified as a suspect, Knox was offered a second photo array, and he chose Demorst – though with the caveat that he was only seventy or eighty percent certain. Knox testified that he was later (he was not clear as to when) shown another photograph of Demorst from which he was able to confirm the identification.

¶12. Demorst further alleges that the officer who showed Knox the single photograph also

7

made a statement confirming that Knox had made a correct tentative identification of the suspect and urging him to confirm it, apparently before Knox himself had confirmed the photograph was the killer with certainty. But the testimony, which was an affirmative response to an ambiguous, compound question on cross-examination, fails to support this claim.[4] In fact, Knox subsequently made it clear that he was referring to the photograph of Demorst that appeared in the second array, and his full account of the presentation of the second photo array gives no reason to suspect that police officers suggested he choose Demorst or confirmed his choice as being correct prior to presenting him the additional photograph.

¶13. In order to suppress the pretrial identification, the burden of proof would have been on Demorst to show, from the totality of the circumstances, that the identification was "so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification." *Stewart v. State*, 131 So. 3d 569, 572-73 (¶9) (Miss. 2014) (citation omitted). Even if we were to ignore the fact that Demorst himself introduced this evidence, the out-of-court identification by Knox is essentially moot because plain error requires prejudice to the outcome of the trial, and that could not be found if we were to uphold the in-court identification. *See Willie*, 204 So. 3d at 1279 (¶29). To suppress the in-court identification,

---

[4] While Demorst contends in his brief on appeal that the officer asked, "[I]s this him, you can't hardly miss that, can you?," the question directed to Knox actually appears in the record as: "They said is this him; you can't hardly miss that, can you?" Knox responded simply "yes, sir." The semicolon suggests some other meaning to the second part of the question from the one Demorst asserts.

Demorst's burden is even higher – Demorst would have to show that "the identification was so impermissibly suggestive as to give rise to a very substantial likelihood of *irreparable* misidentification." *Stewart*, 131 So. 3d at 573 (¶10) (citation omitted; emphasis in original). The court would then have to determine whether there was an independent basis for the identification – whether it was reliable enough to be admissible despite the suggestiveness of the identification procedure. *Id.* at 572 (¶7). The trial court would look to five factors: "(1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness'[s] degree of attention, (3) the accuracy of the witness's prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation." *Id.* at (¶8) (citation omitted). If the identification were found to be reliable notwithstanding an impermissibly suggestive procedure, its credibility and weight would be left to the jury. *Kimbrough v. State*, 379 So. 2d 934, 936 (Miss. 1980).

¶14. Our courts have candidly acknowledged that this is a high burden for a defendant to meet, even when the issue is properly preserved; "in practice, Mississippi tends to place a heavy burden on defendants who are contesting the propriety of a pretrial identification procedure." *Corrothers v. State*, 148 So. 3d 278, 298 (¶38) (Miss. 2014).

¶15. While Demorst seems to fault the police for showing Knox a second photo array after he already picked someone from the first one, he presents no authority that this procedure is proscribed. The first photo array did not contain Demorst's photograph, as Demorst had not

9

yet been identified as a suspect, and the man Knox selected was determined to have been incarcerated at the time of the murder. Demorst cannot argue that the second array contained other suggestive elements because it was never entered into evidence or otherwise made a part of the record on appeal.

¶16. While we agree with Demorst that the presentation of a single photograph for identification is generally unduly suggestive, that is not what occurred here. Knox was shown the additional photograph only after picking Demorst from the second photo array. Knox admitted he was only seventy or eighty percent sure of the identification based on that photograph, and we are mindful that positive feedback from police officers can be suggestive in the sense that it may boost a witness's confidence in his identification. But we cannot say that what occurred here was so suggestive that it precluded Knox from identifying Demorst in court – that it "[gave] rise to a very substantial likelihood of irreparable misidentification." *Stewart*, 131 So. 3d at 573 (¶10). Certainly it is not so suggestive that we can call it plain error. And even if we were to find the procedure unduly suggestive, the five reliability factors outlined above would support admitting the identification anyway: although it was dark, Knox got out of the car and spoke directly to the shooter; the shooter had Knox's full attention prior to his drawing the pistol; Knox's description of the shooter was generally consistent with Demorst's appearance; ultimately, Knox was unequivocal in his identification of Demorst; and the length of time between the killing and Knox's identification of Demorst was only a few days. As to the prior misidentification, "an earlier failure to identify, or even

10

a positive identification of a different suspect, does not require exclusion of an in-court or pretrial identification, if otherwise reliable." *Howard v. Bouchard*, 405 F.3d 459, 484 (6th Cir. 2005).

¶17.    Moreover, Demorst fails to meet another requirement of plain error – a showing that the alleged error affected the result of the case. *See Willie*, 204 So. 3d at 1279 (¶29). Knox's identification of Demorst was strongly corroborated by additional evidence. Knox was always unequivocal that the man who shot Miller was the same man he had been speaking with on the telephone moments before. Knox testified that the man on the phone directed him to the location where he found the shooter and that he actually saw the shooter while the two were still speaking on the phone. The shooter initially pretended to proceed with the drug deal that had been previously discussed on the phone, and then he called Knox after the shooting and warned him not to speak to the police. The phone records and Lawrence's testimony established, overwhelmingly, that Demorst was the man on the phone and thus the killer of Hunter Miller.

¶18.    The record as to the circumstances of Cooper's initial identification of Demorst as the shooter is even less developed. Cooper simply testified that – about five days after the shooting, after Demorst was arrested – the police showed him a photograph of Demorst, and he identified him as the shooter. While Cooper never testified whether he was or was not shown other photographs at the same time, we could not find plain error here even assuming Cooper's identification of Demorst stemmed from a single photograph "show up." Given

11

Knox's identification of Demorst and the corroborating evidence we have previously discussed, Cooper's identification was cumulative and would not have changed the result of the trial.

¶19. We cannot find plain error in the admission of in-court identifications by either Cooper or Knox.

### 2. Jailhouse Recordings – Plain Error

¶20. Next, Demorst argues that this Court should find plain error on appeal in the admission into evidence of five audio recordings (and accompanying transcripts) of conversations between him and his girlfriend. The recordings were made during the week after Demorst was arrested for the murder, through the jailhouse telephone system. At trial, Demorst moved to suppress the recordings, but on the theory that they were illegally obtained based on Demorst's lack of consent to the conversations being recorded. The motion to suppress was denied, and Demorst does not challenge that decision on appeal. Instead, he contends that the trial court should have refused to admit the recordings into evidence, sua sponte, because they were irrelevant, and that the failure to do so was plain error.

¶21. The record reflects that, at trial, Demorst's attorney successfully moved to have one of the recordings redacted, but he otherwise did not object to their admission into evidence. So Demorst once again must travel under the plain error standard.

¶22. On appeal, Demorst makes much of the fact that the trial judge observed several times on the record that he did not know if the recordings were relevant (as he had not yet heard

12

them), and that the record does not contain much in the way of argument on that point since, as we said, the recordings were admitted into evidence without objection.

¶23. We find no merit to this issue, as the recordings were clearly relevant. In some of the recordings, Demorst and his girlfriend repeatedly rehearse an alibi defense, sometimes in the third person as if they were talking about other people. In another, they discuss getting a man (who Demorst had claimed to have been with in his interview with the police) to provide Demorst with an alibi. Demorst's girlfriend tells him that the man has refused, and Demorst urges her to continue her efforts, apparently suggesting that she pay the man to do so.[5] Later in the recording the girlfriend cautions Demorst about what they say on the phone, and Demorst acknowledges her concern and says he is "not dumb."

¶24. Under Mississippi law, evidence of consciousness of guilt is evidence of guilt itself. *McClendon v. State*, 387 So. 2d 112, 115 (Miss. 1980). Evidence that the defendant attempted to fabricate an alibi or to pay someone to falsely provide him with one is relevant and admissible as evidence of consciousness of guilt. A similar scenario occurred in *Dickey v. State*, 86 Miss. 525, 38 So. 776 (1905), where the defendant wrote a letter offering to pay $200 for fabricated exculpatory testimony from a witness. Although the letter was never delivered, our supreme court found it to be an attempted fabrication and relevant and admissible. In support, it quoted Wigmore's "recent" treatise on evidence:

---

[5] After being told the man has firmly refused, Demorst says: "Shid [sic]. Them green guys, you hear me? You hear me?" "Them green guys." "You know what I'm talking about?" Then, perhaps jokingly, Demorst suggests she perform oral sex on the man.

13

It has always been understood – the inference, indeed, is one of the simplest in human experience – that a party's falsehood or other frauds in the preparation and presentation of his cause, his fabrication or suppression of evidence by bribery or spoliation, and all similar conduct, is receivable against him as an indication of his consciousness that his case is a weak or unfounded one, and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit. The inference thus does not apply itself necessarily to any specific fact in the cause, but operates indefinitely, though strongly, against the whole mass of alleged facts constituting his cause.

*Id.* at 536, 38 So. at 777-78 (quoting *Wigmore on Evidence* § 278 (1904)).

¶25.    In another recording, Demorst speaks about his "downfall," which he attributed to "the streets," gambling, and a large loss he suffered immediately before he was incarcerated. We cannot call its admission plain error because it was evidence of a motive for robbery, and evidence of the defendant's motive is relevant and generally admissible. *See, e.g., O'Connor v. State*, 120 So. 3d 390, 397-98 (¶19) (Miss. 2013).

¶26.    We find no plain error in the admission of the jailhouse recordings.

**3.    Ineffective Assistance of Counsel**

¶27.    Finally, Demorst contends that he received constitutionally ineffective assistance of counsel at trial.

¶28.    To succeed on an ineffective-assistance-of-counsel claim, Demorst must meet both prongs of the test laid out in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and adopted by the Mississippi Supreme Court in *Stringer v. State*, 454 So. 2d 468, 476-77 (Miss. 1984). "First, the defendant must show that counsel's performance was deficient." *Strickland*, 466 U.S. at 687. Second, the defendant must "show that there is a reasonable

14

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

¶29.   Mississippi Rule of Appellate Procedure 22(b) requires claims of ineffective assistance of counsel to be raised on direct appeal if they are "based on facts fully apparent from the record."   But the Mississippi Supreme Court has observed:

> It is unusual for this [C]ourt to consider a claim of ineffective assistance of counsel when the claim is made on direct appeal.   This is because we are limited to the trial court record in our review of the claim[,] and there is usually insufficient evidence within the record to evaluate the claim . . . . [W]here the record cannot support an ineffective assistance of counsel claim on direct appeal, the appropriate conclusion is to deny relief, preserving the defendant's right to argue the same issue through a petition for post-conviction relief.   This Court will rule on the merits on the rare occasions where (1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate to allow the appellate court to make the finding without consideration of the findings of fact of the trial judge.

*Wilcher v. State*, 863 So. 2d 776, 825 (¶171) (Miss. 2003) (internal citations and quotations omitted).

¶30.   Demorst raises numerous contentions under the umbrella of this issue, only a few of which are capable of being addressed on direct appeal.   First, Demorst contends that his attorney was ineffective in failing to contemporaneously object to what he calls false factual claims made by the prosecutors during their closing arguments.   But it is apparent from reviewing the record that any of these objections, even if they had been timely, would have been futile.   In closing arguments, prosecutors are allowed "wide latitude [that] extends not only to the facts presented in evidence, but also to deduction and conclusions he may

15

reasonably draw therefrom." *Dampier v. State*, 973 So. 2d 221, 235 (¶39) (Miss. 2008) (citation omitted). What Demorst calls unsupported factual claims are actually arguments – for example, a witness testified that the shooter picked something up after the shooting, and the prosecutor contended that it was a shell casing. This argument was an attempt to reconcile the witnesses' testimony that there were multiple gunshots with the fact that only one shell casing was found at the scene; the prosecutor argued that the shooter picked up the second casing. Without belaboring the point, this was not an unsupported factual claim but a permissible argument, and it was clearly presented as such by the prosecutor. Likewise, Demorst's contention that prosecutors "invaded the province of the jury" by "telling [it] how to deliberate" is without merit; the instances he cites are just arguments as to how the jury should weigh various pieces of evidence. Finally, Demorst's challenge to defense counsel's failure to object to the relevance of the jailhouse recordings is also without merit. As we explained above, the jailhouse recordings were relevant, and any objection on the basis of relevance would have been futile.

¶31.    Demorst's remaining contentions are based on issues not fully apparent from the record and thus not capable of being decided on direct appeal. Demorst devotes several pages of argument to the contention that his attorney was constitutionally ineffective for failing to introduce the second photographic "lineup" into evidence – but the lineup does not appear in the record and thus it is impossible for this Court to address the second prong of the *Strickland* analysis – to determine whether it really would have helped Demorst's

16

defense. Likewise, Demorst contends that his counsel was ineffective for failing to introduce evidence that would successfully authenticate a Facebook post allegedly made by Cooper suggesting uncertainty about Demorst's guilt, but Cooper denied making the post and on appeal Demorst just begs the question of whether such evidence actually existed in the first place. Finally, Demorst challenges counsel's decision not to move to suppress the identifications, but "[t]he decision to make certain objections falls within the ambit of trial strategy and cannot give rise to an ineffective assistance of counsel claim." *Willie v. State*, 204 So. 3d 1268, 1275 (¶16) (Miss. 2016) (citation omitted). The record gives this Court no basis to find ineffective assistance of counsel, and, indeed, it strongly suggests that the decision not to move to suppress the identifications was strategic. Demorst's attorney thoroughly cross-examined Knox and Cooper, and he appears to have had good reason to try to frame the reliability of their identifications as the central issue of the case, given the strength of the other evidence against Demorst. Nonetheless, as we have said, this issue is not fully developed in the record and cannot be conclusively decided on direct appeal.

¶32. We deny relief on these contentions without prejudice to a future post-conviction claim. *See Wilcher*, 863 So. 2d at 825 (¶171).

¶33. **THE JUDGMENT OF THE CIRCUIT COURT OF JACKSON COUNTY OF CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITHOUT ELIGIBILITY FOR EARLY RELEASE, EARNED CREDIT, OR PAROLE, AND TO PAY A $10,000 FINE AND $2,500 IN RESTITUTION, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO JACKSON COUNTY.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, CARLTON, WILSON, GREENLEE AND WESTBROOKS, JJ., CONCUR.**