# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-KA-01006-COA

**ANTONIO LARON BRIDGES**                                                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                    **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 03/29/2018 |
| TRIAL JUDGE: | HON. DAVID H. STRONG JR. |
| COURT FROM WHICH APPEALED: | PIKE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: HUNTER NOLAN AIKENS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: SCOTT STUART |
| DISTRICT ATTORNEY: | DEE BATES |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 03/31/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE BARNES, C.J., GREENLEE AND McDONALD, JJ.

### BARNES, C.J., FOR THE COURT:

¶1.     In the early morning hours of May 29, 2016, Roy Boss and Cedric Martin sustained multiple gunshot wounds while sitting in Boss's car at an apartment complex in McComb, Mississippi.  Antonio Laron "Ron" Bridges (Bridges) was later identified as the shooter, and he was indicted for two counts of attempted murder, one count of possession of a firearm by a felon, and one count of shooting into a motor vehicle.  A Pike County Circuit Court jury convicted Bridges of all four counts.  Adjudging him to be a habitual offender under Mississippi Code Annotated section 99-19-83 (Rev. 2015), the circuit court sentenced Bridges to serve four concurrent sentences of life imprisonment in the custody of the

Mississippi Department of Corrections (MDOC).[1]  After the court denied his motion for judgment notwithstanding the verdict (JNOV), Bridges appealed.  Finding no error, we affirm.

### STATEMENT OF FACTS AND PROCEDURAL HISTORY

¶2.  The shooting of Boss and Martin resulted from a domestic squabble earlier that evening between Bridges's nephew, Tyreace Bridges, and Tyreace's girlfriend, Latoya Nunnery.  Latoya's brother, Brandon Stewart, and Bridges's sister, Shawn McCray, both lived at the apartment complex where the shooting later occurred.  After the argument with Latoya, Tyreace went to McCray's apartment.  Either Tyreace or McCray called Bridges and Tyreace's brother and father to come to McCray's apartment.  Bridges showed up with his girlfriend, Tyneisha Carter.  Bridges and Tyreace then returned to Latoya's house, where they fought with Stewart and other members of his family.  Martin observed the fight but did not participate.  Tyreace and Bridges left Latoya's house when police arrived.

¶3.  Boss, who was at a nearby bar, heard of the fight and drove to Latoya's house.  Boss and Martin then drove to Stewart's apartment, where Boss backed his Crown Victoria into a parking space.  Bridges, Tyreace, and Tyreace's brother, Clarence, arrived at the apartment complex at approximately the same time in Clarence's vehicle.  According to Boss and Martin, Bridges walked over to Boss's car and began shooting at them.  Ducking down, Martin pulled out a revolver and shot twice at Bridges, who suffered a gunshot wound.  Clarence and Tyreace took Bridges to a nearby hospital.  Boss and Martin were taken by

---

[1] Bridges had been previously convicted of manslaughter and felony drug possession.

ambulance to the hospital with gunshot wounds.

¶4. On January 31, 2017, a grand jury indicted Bridges for two counts of attempted murder, one count of possession of a firearm by a felon, and one count of shooting into a motor vehicle. The indictment was later amended to reflect Bridges's habitual-offender status under section 99-19-83, noting his prior convictions of manslaughter and possession of marijuana with intent to distribute. Prior to trial, defense counsel moved to sever Count III (possession of a firearm by a felon) from the other counts, arguing that the "eliciting of testimony in support of the State's case in the prosecution of Count III would violate and prejudice [Bridges], as to Counts I, II, and IV of the indictment as the Jury could not be expected to disregard this evidence in determining the guilt or innocence of [Bridges] in those Counts." The court denied the motion.

¶5. A trial was held in the Pike County Circuit Court on March 27-29, 2018. John Glapion, a deputy with the Pike County Sheriff's Department, testified that he arrived at the scene of the shooting minutes after the 911 call. When he arrived, there were four people standing around Boss's Crown Victoria. Boss and Martin were inside the car, and Deputy Glapion stated that the two men were "hysterical" and "going into shock." One of the victims told him that Bridges had "come running towards the driver's side of the door and shot them."

¶6. Dr. Shunte Jones, a former emergency-room physician at Southwest Regional Hospital in McComb, treated Boss, Martin, and Bridges on the night of the shooting. She testified that both Boss and Martin suffered life-threatening injuries. With regard to Bridges, she noted

3

that he had a broken nose, a superficial head injury, as well as "an obvious gunshot wound to his right chest."

¶7.     The investigator, Robby Roberts, testified that there were several spent .45-caliber shell casings both inside and outside the Crown Victoria. At the hospital, Investigator Roberts interviewed Clarence, who had transported Bridges in his Suburban. No gun was found in that vehicle. Investigator Roberts interviewed Boss and Martin a few days later (due to the severity of their injuries). Although Martin could not identify the shooter at that time, Investigator Roberts said that Boss, when shown a picture, indicated that Bridges was the shooter. Investigator Roberts was unable to secure the clothing Bridges wore that evening because "[i]t had been destroyed."

¶8.     Stewart testified that Tyreace, Bridges, and other members of Stewart's family had engaged in a "brawl" that evening, but the fight broke up after someone called the police. Stewart said he called Boss, who came over to Latoya's house; Boss and Martin then left to go to the apartment complex. Boss called Stewart, saying that no one was there and that he was coming back to Latoya's house. However, Boss called back seconds later, telling Stewart that he had been shot; so Stewart went to the apartment complex. Stewart testified that he was standing by the Crown Victoria, talking to Boss, and that Boss "gave me his phone, and he asked for a picture because he didn't see his face." Stewart sent Boss a picture of Bridges about an hour later.

¶9.     Boss testified that he had just arrived in town that day. Stewart, whom Boss called "Little B," had been taking care of his car for a few months while he was away for work.

Boss went to a local bar that night, but when he learned of the fight, he went to Latoya's house. From there, Boss drove himself and Martin to Stewart's apartment. Boss noticed a truck following his car; so he backed into the parking space at the apartments. His head was down, and he was "playing with [his] radio" when he heard someone say, "Little B, I'm fixin' to kill you." Boss testified, "So by that time, Mr. Ron [was] right there. He was at the driver's side. He was shooting off in my car." Boss also testified that McCray, Bridges's sister, ran over crying and said, "Eww. Ron shot them boys." Boss acknowledged he did not know Bridges and "[t]hat was his first time seeing [Bridges and McCray]," but Boss said that he looked the shooter "dead in his eyes."

¶10. Martin testified that he had observed the fight between the Bridgeses and the Stewarts, and he rode with Boss back to Stewart's apartment afterward. They backed into a parking space, and Martin said he saw a truck and a car pull in after them and "the defendant walking across the parking lot toward the car." Martin did not notice a gun "until [Bridges] was bringing it up, and he shot at [Boss] first." Martin testified that Bridges continued to shoot, sticking the gun into an open window on the driver's side. Martin was shot five times, and he returned fire with a .22-caliber revolver. He later threw his gun out of the car, which law enforcement recovered.

¶11. Clarence testified that he, Tyreace, and Bridges returned to the apartment. When he parked his Suburban, Clarence noticed a Crown Victoria on the other side of the parking lot with its headlights on. Clarence said that he, Tyreace, and Bridges got out of the Suburban and that he walked toward McCray's apartment; he did not look back to see where Tyreace

5

and Bridges were. When he heard gunshots, Clarence ducked behind a nearby car. After the gunshots stopped, Clarence testified that Bridges was next to him (within arm's reach) holding his side, saying that he had been shot; Tyreace was a few steps behind Bridges. Clarence stated that he never saw Bridges walk in the direction of the Crown Victoria. Clarence and Tyreace put Bridges in the Suburban and took him to the hospital. Clarence did not see a gun.

¶12. McCray testified that she awoke and heard gunshots, went on the front porch, and heard Boss screaming that he had been shot; so she walked over to Boss's car. McCray denied telling Boss that Bridges had shot them, and she said that Boss was on the phone with Stewart when she got to the car. She also testified that Martin was "hollering" about a "fat, baldheaded man with a white beard." McCray stayed downstairs around the parking lot until law enforcement arrived.

¶13. The jury convicted Bridges of all four counts. The circuit court sentenced him as a habitual offender to serve four sentences of life imprisonment in the custody of the MDOC, with the sentences set to run concurrently. Bridges filed a motion for a JNOV, which the trial court denied. On appeal, Bridges argues that he was subject to ineffective assistance of counsel due to defense counsel's failure to raise an objection to the admission of his statement to law enforcement. He claims that the admission of a portion of his statement to law enforcement, in which the interviewer noted Bridges's prior felonies, was prejudicial and constitutes plain error.

**DISCUSSION**

6

¶14. The assignments of error raised by Bridges both pertain to the investigator's mentioning Bridges's prior convictions in a videotaped statement, which was admitted into evidence at trial. During the interview, Investigator Roberts said to Bridges, "I mean, you understand this is gonna go to court, and it's gonna go under [a] big judge. You got some priors. That ain't [going to] look good . . . you got a manslaughter and you got a felony controlled substance. So you know what number three is? This charge. It's serious." Responding to the investigator, Bridges acknowledged that he was a felon.

*A.    Ineffective Assistance of Counsel*

¶15. At trial, the parties agreed to stipulate to Bridges's prior convictions. Jury Instruction 3 also instructed the jury that Bridges was "a convicted felon," and this instruction was given as stipulated by the parties. Because of this stipulation, Bridges now asserts that defense counsel's failure to object to the admission of his statement, to move for a mistrial, or to move to redact Investigator Roberts's comments constitutes ineffective assistance of counsel. Bridges cites *Herrington v. State*, 102 So. 3d 1241, 1245-46 (¶¶15-17) (Miss. Ct. App. 2012), in which this Court found that "trial counsel was deficient in failing to object to the introduction of three prior convictions" into evidence after the parties had already stipulated that the defendant was "a convicted felon." Concluding that "this deficiency prejudiced [the defendant]," we reversed and remanded. *Id*. at 1246 (¶17). The Mississippi Supreme Court has held that "the strategic goal of such stipulation is to curtail the prejudice that might arise if a more detailed and expansive record of prior bad acts is allowed in." *Taylor v. State*, 167 So. 3d 1143, 1147 (¶8) (Miss. 2015).

7

¶16.    Ineffective-assistance-of-counsel claims should ordinarily "be raised in a motion for post-conviction relief, not on direct appeal." *Pinter v. State*, 221 So. 3d 378, 386 (¶18) (Miss. Ct. App. 2017).  The Court "will address such claims on direct appeal when '[(1)] the record affirmatively shows ineffectiveness of constitutional dimensions, or [(2)] the parties stipulate that the record is adequate[,] and the [appellate court] determines that the findings of fact by a trial judge able to consider the demeanor of witnesses, etc., are not needed.'" *Ross v. State*, 288 So. 3d 317, 324 (¶29) (Miss. 2020) (quoting *Bell v. State*, 202 So. 3d 1239, 1242 (¶12) (Miss. 2016)).  In this case, neither party has expressly stipulated that the record is adequate for this Court to make such a finding.

¶17.    Furthermore, "[w]ith respect to the overall performance of the attorney, counsel's choice of whether or not to file certain motions, call witnesses, ask certain questions, or make certain objections falls within the ambit of trial strategy and cannot give rise to an ineffective assistance of counsel claim." *Graham v. State*, 264 So. 3d 819, 822 (¶11) (Miss. Ct. App. 2018) (internal quotation marks omitted) (quoting *Carr v. State*, 873 So. 2d 991, 1003 (¶27) (Miss. 2004)).  When the State requested that Bridges's statement be admitted into evidence, defense counsel consulted with Bridges prior to deciding whether or not to make an objection:

| | |
|---|---|
| THE COURT: | Before we do anything, [defense counsel], if there's going to be a motion -- if there's going to be an objection to this, why was it . . . not handled pretrial in a motion to suppress? |
| [DEFENSE]: | *I'm not sure there's going to be.  That's why I want to review it with my client.* |

THE COURT: Okay. Well, I mean, regardless, whether there's going to be or not, it should have been a matter that should have been handled in a pretrial hearing.

(THE PROCEEDINGS ARE RECESSED FOR A SHORT BREAK.)

. . . .

THE COURT: [Defense], you're not objecting I presume.

[DEFENSE]: No, sir, Your Honor.

(Emphasis added). Thus, it appears from the record that defense counsel's decision not to object to the admission of Bridges's statement was trial strategy. During the videotaped interview, Bridges maintained that he did not have a gun, that he did not shoot anyone, and that he had never seen Boss or Martin before. Bridges told the investigator that he was just walking in the parking lot when "all hell broke loose" and he "got hit." Allowing in the statement provided Bridges the opportunity to relate his version of events to the jury without his testifying and being subject to cross-examination. Had the statement been redacted, the State could have decided not to admit the statement at all, depriving Bridges of that opportunity. However, because Bridges's claim is based on facts not fully apparent from the record, we deny relief without prejudice to Bridges's right to seek leave from the Mississippi Supreme Court to raise his claim of ineffective assistance of counsel through post-conviction relief proceedings under Mississippi Code Annotated section 99-39-7 (Rev. 2015). *See Gunn v. State*, 174 So. 3d 848, 869 (¶83) (Miss. Ct. App. 2014) (finding the issue of ineffective assistance of counsel not "appropriate for resolution on direct appeal" because defense counsel's decisions appear to be trial strategy and counsel "has not been afforded an

opportunity to explain his actions").

### B. Plain Error

¶18. Bridges argues that Investigator Roberts's mentioning of Bridges's prior convictions in the statement violated his fundamental right to a fair trial. Because Bridges did not raise the issue of the admissibility of his statement to law enforcement in his post-trial motion for a JNOV, this issue is procedurally barred from review on appeal. *See Carey v. State*, 80 So. 3d 131, 135 (¶12) (Miss. Ct. App. 2012) (finding a defendant's failure to assert an issue in a post-trial motion procedurally barred him from raising the issue on appeal). Bridges contends that the circuit court's admission of his prior convictions, after the parties had agreed to stipulate, violated Mississippi Rules of Evidence 403 and 404(b) and, thus, constitutes plain error. The plain-error doctrine allows our appellate courts to "recognize obvious error which was not properly raised by the defendant on appeal, and which affects a defendant's 'fundamental, substantive right.'" *Smith v. State*, 986 So. 2d 290, 294 (¶10) (Miss. 2008) (quoting *Debrow v. State*, 972 So. 2d 550, 553 (¶10) (Miss. 2007)). "For the plain-error doctrine to apply, there must have been an error that resulted in a manifest miscarriage of justice or seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *Hall v. State,* 201 So. 3d 424, 428 (¶12) (Miss. 2016) (internal quotation marks omitted). "[I]n order to determine if plain error has occurred, we must determine if the trial court has deviated from a legal rule, whether that error is plain, clear, or obvious, and whether the error has prejudiced the outcome of the trial." *Pinter v. State*, 221 So. 3d 378, 384 (¶12) (Miss. Ct. App. 2017) (emphasis omitted) (quoting *Green v. State*,

183 So. 3d 28, 31 (¶6) (Miss. 2016)). In this instance, we can find no plain or obvious error or deviation from a legal rule in the trial court's admission of the investigator's statement. *See Demorst v. State*, 228 So. 3d 323, 328 (¶9) (Miss. Ct. App. 2017) ("[W]e are aware of no legal rule requiring a trial court to sua sponte suppress evidence.").

¶19.   **AFFIRMED.**

**CARLTON AND J. WILSON, P.JJ., GREENLEE, WESTBROOKS, TINDELL, LAWRENCE, McCARTY AND C. WILSON, JJ., CONCUR. McDONALD, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**