# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2016-KA-00804-COA

**BRYAN MORTON**                                                     **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                           **APPELLEE**

DATE OF JUDGMENT:                    05/11/2016
TRIAL JUDGE:                         HON. ISADORE W. PATRICK JR.
COURT FROM WHICH APPEALED:           WARREN COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:              OFFICE OF STATE PUBLIC DEFENDER
                                     BY: MOLLIE MARIE MCMILLIN
ATTORNEY FOR APPELLEE:               OFFICE OF THE ATTORNEY GENERAL
                                     BY: SCOTT STUART
DISTRICT ATTORNEY:                   RICHARD EARL SMITH JR.
NATURE OF THE CASE:                  CRIMINAL - FELONY
DISPOSITION:                         AFFIRMED - 11/21/2017
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**LEE, C.J., FOR THE COURT:**

¶1.     Following a jury trial in the Warren County Circuit Court, Bryan Morton was found guilty of attempted murder, armed robbery, and burglary of a dwelling. Morton was sentenced to thirty years for the attempted-murder conviction and thirty years for the armed-robbery conviction, with the sentences ordered to run consecutively. He was sentenced to twenty years for the burglary conviction, which was ordered to run concurrently with the attempted-murder and armed-robbery convictions, with all sentences to be served in the custody of the Mississippi Department of Corrections. Morton now appeals. Finding no error, we affirm.

**FACTS AND PROCEDURAL HISTORY**

¶2. On May 4, 2014, Charlie Arnold's house in Warren County, Mississippi, was broken into while she was asleep in her bed. Arnold testified that she awoke to Kimberly Chapman hitting her over the head with a walking stick. Arnold recognized Chapman because Chapman had dated Arnold's son while he was in high school. Arnold testified that she heard a baby crying and that Chapman continued to hit her. She also testified that she noticed a man in her house during the attack, and that he hit her on top of the head with a shotgun. She could not recall all of the attack because she kept passing out.

¶3. Around 11:30 a.m., Investigator Jason Bailess with the Warren County Sheriff's Department responded to a dispatch call where someone had reported seeing a woman stranded on Highway 80 in Vicksburg, holding an infant and covered in blood. Investigator Bailess arrived on the scene and noticed a woman – later identified as Chapman – covered in what appeared to be wet blood and holding a baby while standing next to a maroon Cadillac sedan. Investigator Bailess questioned Chapman about the blood on her clothes and body, and Chapman stated she had been in a fight the night before. Investigator Bailess, however, noticed that Chapman did not have any injuries and also had dried blood on her hands around her fingernails. He called for another officer to come to the scene and had Chapman and her baby sit in the officer's car while he looked in the window of Chapman's Cadillac. Investigator Bailess noticed from outside the car that a sportsman's license was on the front seat of the car and had the last name "Arnold" on it with an address. Once the other officer arrived, Investigator Bailess went to the address, which he stated he was familiar with

2

from previous calls, to check on the woman who lived there. He called for assistance to meet him at the house.

¶4. Investigator Bailess testified that when he knocked on the door of the house, it opened because it was not properly shut. He called out for Arnold, and noticed blood spots on the living-room floor. When the officers got to Arnold's bedroom, Investigator Bailess noticed that the mattresses were flipped over off the bed, and that there was blood all over the bedroom. They found a broken shotgun with blood on the butt of the gun. Arnold was on the side of the bed opposite the bedroom entrance. She was covered in blood and had severe head wounds. At the scene, she told officers that a woman named Kim Chapman had broken into her house and started beating her and that there was a man with Chapman, but she did not see him. She stated that she heard a man's voice behind her and then was hit from behind. And that Chapman stabbed her. Arnold was taken to the University of Mississippi Medical Center in Jackson, Mississippi. Upon her release, she spent 120 days in the Vicksburg Convalescent Home for further recovery.

¶5. At the police station, Chapman gave a statement, telling police that she and Morton had gone to Arnold's house to borrow money from her. She stated that Morton went through the window and assaulted Arnold. In her statement, Chapman admitted to hitting Arnold only once, although months later at a bond hearing she admitted to hitting Arnold multiple times. She denied having a gun or knife, and stated she never saw Morton with the shotgun.

¶6. In Chapman's Cadillac, investigators found Arnold's driver's license, Visa card, Social Security card, prescription medications, and a check from Arnold's account. They

also recovered a jacket from the front-passenger floorboard, which was sent to the crime lab for testing. A data extraction performed on Chapman's phone showed contacts, including one titled "Brian," with a text sent from Chapman to Morton on the day of the burglary and attack, asking "wanna come[] help[?]" From the night of May 3 to morning of May 4, Morton and Chapman exchanged twenty-nine calls altogether, including missed and answered calls. An arrest warrant was issued for Morton. Sheriff's deputies collected a knife and shotgun barrel from a Jeep that Morton had been known to drive, which was parked at Colby Ashley's house on Massey Road. Ashley is Chapman's cousin.

¶7.     DNA testing on the jacket recovered in Chapman's car yielded results consistent with the sample taken from Arnold. Male DNA was also found on the jacket, and the forensic examiner could not exclude Morton or any of his patrilineal male relatives. A sample from the broken gun stock was consistent with Arnold's DNA. The sample from the walking cane yielded a partial profile that could have come from Arnold.

¶8.     At trial, Arnold testified that Chapman or the man entered the home through a side window of the house and that she suspected that the one who entered through the window let the other through the front door. She testified that Chapman and the man took cash from her purse, the purse itself, her prescription pills, and her wedding ring.

¶9.     Chapman testified against Morton at trial and stated that she had only met Morton a couple of times before the night of May 3—once at Ashley's house, and another time when she bought crystal meth from Morton. She testified that she initiated contact with Morton on the night of May 3 because she needed money and thought Morton could help her get it.

4

She mentioned Arnold's house to Morton, and Morton agreed to help Chapman steal from Arnold. Chapman stated that when she and Morton got to Arnold's house, the window she had planned to enter through was blocked, and Morton entered through another window. When Chapman went inside, she saw Morton tying up Arnold with a rope, and that Arnold was already covered in blood at this point and had a gash in her forehead. While they were looking for valuables to take, Arnold got loose, so Morton handed her a weapon, and Chapman hit Arnold with it. She stated that while she was trying to put Arnold back on the bed, Morton left in Chapman's car. Chapman called Morton, but he did not answer. Morton eventually returned to Arnold's house to pick Chapman up, and they went back to Ashley's house on Massey Road.

¶10. Morton testified in his own defense that he never left Ashley's house on Massey Road that night. Waylon Jones, who was also living at Ashley's house at the time, testified as an alibi witness for Morton. Jones told investigators that Morton never left Ashley's house that night. Ashley's girlfriend, Lee Ann Elliot, also lived at the house on Massey Road. Elliot told investigators that she had gone to sleep early that night, but the next day Morton told her that he and Chapman had gone to Arnold's home with the intention of stealing her prescription medicine and money. She further testified that Morton told her that when Arnold recognized Chapman, Chapman told Morton that she would now have to kill Arnold. Morton said that he did not want to hit Arnold, but he had to because she saw Chapman's face.

¶11. Following a trial on the merits, a jury found Morton guilty of attempted murder, armed

robbery, and burglary of a dwelling. Morton now appeals, and we address his issues in turn.

## DISCUSSION

### I.      Sufficiency of the Indictment

¶12.    In his first issue on appeal, Morton claims that the indictment was fatally defective for failure to charge an essential element of the crime. Specifically, Morton argues that the indictment failed to state whether he "failed" to complete or was "prevented" from completing the act of murder; thus, he argues that indictment was legally insufficient to charge him with attempted murder.

¶13.    "[W]hether an indictment is defective is an issue of law and therefore deserves a relatively broad standard of review, or de novo review." *Colburn v. State*, 201 So. 3d 462, 469 (¶20) (Miss. 2016) (quoting *State v. Hawkins*, 145 So. 3d 636, 638 (¶3) (Miss. 2014)). "[A]n indictment must contain (1) the essential elements of the offense charged, (2) sufficient facts to fairly inform the defendant of the charge against which he must defend, and (3) sufficient facts to enable him to plead double jeopardy in the event of a future prosecution for the same offense." *Townsend v. State*, 188 So. 3d 616, 620 (¶13) (Miss. Ct. App. 2016) (quoting *Gilmer v. State*, 955 So. 2d 829, 836-37 (¶24) (Miss. 2007)). "The primary purpose of an indictment is to give a defendant fair notice of the crime charged." *Williams v. State*, 169 So. 3d 932, 935 (¶9) (Miss. Ct. App. 2014). "The Mississippi Supreme Court has stated, 'so long as a fair reading of the indictment, taken as a whole, clearly describes the nature and cause of the charge against the accused, the indictment is legally sufficient.'" *Martin v. State*, 65 So. 3d 882, 884 (¶7) (Miss. Ct. App. 2011) (quoting

*Sanderson v. State*, 883 So. 2d 558, 561 (¶9) (Miss. 2004)).

¶14. Attempted murder is defined in Mississippi Code Annotated section 97-1-7(2) (Rev. 2014) as follows:

> Every person who shall design and endeavor to commit an act which, if accomplished, would constitute an offense of murder under [Mississippi Code Annotated section 97-3-19 (Supp. 2016)], but shall fail therein, or shall be prevented from committing the same, shall be guilty of attempted murder . . . .

Morton's indictment charged that Morton:

> [D]id willfuly, unlawfully, and feloniously, and with deliberate design to cause his/her death, . . . attempt to kill Charlie Arnold[,] a human being, under such circumstances that, if accomplished, would constitute an offense of murder under [section] 97-3-19 by repeatedly striking Charlie Arnold in the head with a metal walking stick, without authority of law, in violation of [section] 91-1-7 . . . .

¶15. "An attempt to commit a crime consists of three elements: (1) an intent to commit a particular crime, (2) a direct ineffectual act done toward its commission, and (3) the failure to consummate its commission." *Craig v. State*, 201 So. 3d 1108, 1111 (¶9) (Miss. Ct. App. 2016) (quoting *Brooks v. State*, 18 So. 3d 833, 841 (¶33) (Miss. 2009)). So, while failure to consummate the commission of a crime is an element of attempt, "[o]ur courts have long held that 'the failure to charge the third element of attempt does not make an indictment defective.'" *Williams v. State*, 216 So. 3d 409, 413 n.4 (Miss. Ct. App. 2017) (quoting *Spearman v. State*, 58 So. 3d 30, 36 (¶19) (Miss. Ct. App. 2011)). "Using the word 'attempt' puts a defendant on notice that the State will prove that the crime was not completed." *Id.* (quoting *Neal v. State*, 936 So. 2d 463, 467 (¶13) (Miss. Ct. App. 2006)).

¶16. Here, Morton's indictment sufficiently notified him of the charge against

7

him—namely, attempted murder. The indictment used the word "attempt," as well as contained the language that the crime, "if accomplished, would constitute an offense of murder," indicating the incompleteness of the attempted crime. Accordingly, we find no merit to Morton's argument that his indictment was fatally defective.

## II. Jury Instructions

¶17. In his second issue, Morton contends that the jury instructions given for the attempted-murder charge omitted an essential element and varied materially from the indictment. Morton also claims that the instruction given for the armed-robbery charge materially varied from the indictment and thus constituted a constructive amendment.

¶18. "Jury instructions are generally within the discretion of the trial court[,] and the settled standard of review is abuse of discretion." *Moody v. State*, 202 So. 3d 1235, 1236-37 (¶7) (Miss. 2016) (quoting *Bailey v. State*, 78 So. 3d 308, 315 (¶20) (Miss. 2012)). When read together as a whole, "if the jury instructions fairly state the law of the case and create no injustice, then no reversible error will be found." *Bailey*, 78 So. 3d at 315 (¶20). However, "failure to instruct the jury on the essential elements of the crime is plain error." *Bolton v. State*, 113 So. 3d 542, 544 (¶4) (Miss. 2013) (quoting *Rogers v. State*, 95 So. 3d 623, 632 (¶30) (Miss. 2012)).

### A. Attempted-Murder Instruction

¶19. Morton argues that the jury instruction S-1B omits the words "under such circumstances that, if accomplished, would constitute an offense of murder," and thus, the instructions omitted an essential element of the crime. The S-1B instruction, in relevant part,

8

provided that for the jury to find Morton guilty of attempted murder, it must find that Morton: "1. Did purposefully or knowingly and unlawfully and with deliberate design . . . attempt to commit the murder of Charlie Arnold, a human being; and 2. [he] failed to actually kill Charlie Arnold, and therefore did not meet the elements of murder . . . ." While jury instructions *should* track the language in the indictment, their failure to do so is not fatally defective, so long as "they do accurately follow the requisite elements of the crime." *Neal v. State*, 15 So. 3d 388, 398 (¶16) (Miss. 2009). Here, the jury instructions accurately followed the requisite elements of attempted murder by charging that Morton had to have (1) intended to murder Arnold, (2) attempted to murder Arnold, and (3) failed to actually kill Arnold.

¶20. In regard to Morton's claim that the jury instructions constructively amended the indictment, we note that "[n]ot all variances between the indictment and instructions constitute a constructive amendment." *Graham v. State*, 185 So. 3d 992, 1001 (¶25) (Miss. 2016).

> A constructive amendment of an indictment occurs when the jury is permitted to convict the defendant upon a factual basis that effectively modifies an essential element of the offense charged. A constructive amendment of an indictment is reversible per se. Reversal is automatic because the defendant may have been convicted on a ground not charged in the indictment.

*Id.* (quoting *Bell v. State*, 725 So. 2d 836, 855-56 (¶61) (Miss. 1998)). The central question is "whether the variance is such as to substantially alter the elements of proof necessary for a conviction." *Id*.

> As long as the change does not "materially alter facts which are the essence of the offense on the fact of the indictment as it originally stood or materially

9

alter a defense to the indictment as it originally stood" in a way that would prejudice the defendant's case, then the amendment is permissible.

*Id.* (quoting *Miller v. State*, 740 So. 2d 858, 862 (¶13) (Miss. 1999)).

¶21. In the instant case, the variance between the indictment and the jury instructions did not substantially alter the elements of proof necessary for a conviction. The jury was charged that to convict Morton of attempted murder, it had to find beyond a reasonable doubt that Morton had intended to commit murder, attempted to do so, and failed to do so. Thus, the jury was instructed on all the elements of proof necessary for a conviction, and the variance in no way prejudiced Morton's defense. As such, this issue is without merit.

### B. Armed-Robbery Instruction

¶22. Morton also claims that the instruction on armed robbery materially varied from the indictment and constituted a constructive amendment. In relevant part, the indictment stated that Morton "did willfully, unlawfully[,] and feloniously take" certain property from Arnold, while the jury instructions charged an "attempt to take." Morton argues that this variance amounted to a constructive amendment of the indictment because it did not require the jury to find that Morton actually took the items.

¶23. Mississippi Code Annotated section 97-3-79 (Rev. 2014) defines the crime of armed robbery:

> Every person who shall feloniously take or attempt to take from the person or from the presence the personal property of another and against his will by violence to his person or by putting such person in fear of immediate injury to his person by the exhibition of a deadly weapon shall be guilty of robbery . . . .

¶24. "[I]n Mississippi both an attempt to take and an actual taking of another's personal

10

property against his will by violence to his person or by putting such person in fear of immediate injury to his person by the exhibition of a deadly weapon constitutes robbery." *Houston v. State*, 811 So. 2d 371, 372 (¶4) (Miss. Ct. App. 2001) (quoting *Harris v. State*, 445 So. 2d 1369, 1370 (Miss. 1984)). Thus, the variance is immaterial. If the jury found that Morton actually took the property, he was guilty of robbery. If the jury found that Morton only attempted to take the property, he was guilty of robbery. "According to [the armed-robbery] statute, a person can be convicted of armed robbery while attempting to complete the crime." *Putnam v. State*, 877 So. 2d 468, 471 (¶10) (Miss. Ct. App. 2003). As such, the variance between the indictment and the jury instructions did not substantially alter the elements of proof necessary for a conviction of armed robbery. Morton was not prejudiced in his defense. The issue is without merit.

### III. Ineffective-Assistance-of-Counsel Claim

¶25. Morton alleges he received ineffective assistance of counsel because his attorney did not request an alibi jury instruction. He argues that because of the lack of instruction, the jury did not know that Morton was not required to establish the truth of his alibi, and that the error prejudiced his defense.

¶26. On direct appeal, a claim for ineffective assistance of counsel "should only be addressed when '(1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate to allow the appellate court to make the finding without consideration of the findings of fact of the trial judge.'" *Reed v. State*, 204 So. 3d 785, 789 (¶16) (Miss. Ct. App. 2016) (quoting *Johnson v. State*, 196 So.

3d 973, 975 (¶7) (Miss. Ct. App. 2015)). Here, the parties do not stipulate that the record is adequate for the appellate court to make a finding on direct appeal. "Thus, the only proper inquiry is whether the record affirmatively shows that [the defendant] was denied effective assistance of counsel." *Id*. "Where the record cannot support an ineffective-assistance-of-counsel claim on direct appeal, the appropriate conclusion is to deny relief, preserving the defendant's right to argue the same issue through a petition for [postconviction relief]." *Id*. (quoting *Johnson*, 196 So. 3d at 975 (¶8)).

¶27.    In an ineffective-assistance-of-counsel claim,

> a defendant must show that: (1) his counsel's performance was deficient, and (2) this deficiency prejudiced his defense. The burden of proof rests with the defendant to prove both prongs. Under *Strickland*,[1] there is a strong presumption that counsel's performance falls within the range of reasonable professional assistance. To overcome this presumption, the defendant must show that there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different.

*Renfrow v. State*, 202 So. 3d 633, 636 (¶7) (Miss. Ct. App. 2016) (quoting *Maggitt v. State*, 26 So. 3d 363, 365 (¶12) (Miss. Ct. App. 2009)). There is also a presumption that decisions made by defense counsel are strategic, and this Court "will not second-guess counsel's decisions that fairly may be characterized as strategic." *Shinn v. State*, 174 So. 3d 961, 966 (¶12) (Miss. Ct. App. 2015). Finally, we look "at the totality of circumstances to determine whether counsel's efforts were both deficient and prejudicial." *Howell v. State*, 163 So. 3d 240, 259 (¶49) (Miss. 2014) (quoting *Williams v. State*, 73 So. 3d 1125, 1129 (¶12) (Miss. 2011)).

---

[1] *Strickland v. Washington*, 466 U.S. 668 (1984).

¶28. There is nothing in the record that indicates why Morton's counsel did not request an alibi instruction. Given the strong presumption that decisions made by defense counsel are strategic, Morton's trial counsel may have abandoned the alibi defense after hearing Chapman's and Jones's testimonies. "[E]ven without an alibi instruction, the jury was still able to consider their testimonies and to find that there was reasonable doubt as to whether" Morton was guilty of the crimes charged. *Wilson v. State*, 198 So. 3d 408, 415 (¶23) (Miss. Ct. App. 2016). Furthermore, the trial court instructed the jury that Morton was presumed innocent and that the burden was on the State to prove his guilt beyond a reasonable doubt. The trial court also instructed the jury that Morton was not required to prove his innocence. There was nothing that prevented the jury from considering Morton's alibi defense. We cannot say that the trial record, standing alone, validates Morton's ineffective-assistance-of-counsel claim. Accordingly, we decline to address the claim, in order to preserve Morton's right to argue the issue in a PCR motion.

### IV. Morton's Supplemental Brief

¶29. In addition to the arguments submitted by Morton's appellate counsel, Morton filed a supplemental brief raising additional issues, which we now address. We do not address his additional issues raised in his reply brief, as arguments raised for the first time in a reply brief are procedurally barred. *Ogunbor v. May*, 204 So. 3d 840, 848 (¶33) (Miss. Ct. App. 2016).

### A. Prior-Bad-Acts Testimony

¶30. Morton argues that the trial court erred by allowing inadmissible testimony solicited by the prosecution of Morton's prior criminal activity. He states that this inadmissible

13

testimony prejudiced the minds of the jurors and constitutes plain error. "For this Court to apply the plain-error doctrine, 'a party must prove that an error occurred which resulted in a manifest miscarriage of justice. This doctrine is only available when a defendant's substantive or fundamental rights have been violated.'" *Nunnery v. State*, 126 So. 3d 105, 110 (¶20) (Miss. Ct. App. 2013) (quoting *Starr v. State*, 997 So. 2d 262, 266 (¶11) (Miss. Ct. App. 2008)).

¶31.  Morton's issue refers to Chapman's statement elicited in the following exchange:

> [State]: At some time on May 3rd, 2014, did you initiate contact with Bryan Morton?
>
> [Chapman]: Yes, sir.
>
> [State]: And why did you do that?
>
> [Chapman]: Because I was trying to find a way to make some money and I knew he had broke into a house before with my ex-boyfriend and my cousin[.]

¶32.  Morton argues that Chapman's statement was evidence of prior criminal activity and thus the trial court erred in admitting the testimony. However, the record reflects that the trial court did not admit the testimony. Morton's counsel objected to the statement on the ground of hearsay, and the objection was sustained. Additionally, the trial court made an on-the-record finding that Chapman's statement be stricken. Thus, the statement was not admitted.

¶33.  Notwithstanding that the statement at issue was not admitted, Morton's objection at trial was predicated on the ground of hearsay—not the inadmissibility of prior bad acts. "If the objection on appeal differs from the objection at trial, the issue is not properly preserved

14

for appellate review." *City of Natchez v. Jackson*, 941 So. 2d 865, 871 (¶14) (Miss. Ct. App. 2006) (citing *Belmont Homes Inc. v. Stewart*, 792 So. 2d 229, 239 (¶45) (Miss. 2001)). Additionally, while "[e]vidence of a prior criminal activity on the part of one criminally accused is inadmissible where the prior offense has not resulted in a conviction," it "is admissible when necessary to tell a complete story to the jury." *Conerly v. State*, 879 So. 2d 1101, 1106-09 (¶¶14, 19) (Miss. Ct. App. 2004). Here, Chapman was telling the complete story of why she enlisted the help of Morton in committing the crimes against Arnold. The statement was objected to on the ground of hearsay, and the objection sustained. This issue is without merit.

### B.     Opinion Testimony

¶34.    Morton argues that the trial court erred by allowing a State's witness to testify regarding the belief or credibility of an alibi witness's testimony. He argues that the statement at issue was improper opinion testimony by a layperson. Morton specifically refers to the following testimony of Investigator Randy Lewis, regarding an alibi statement he took from Jones:

> [State]: Did you find the statement of Waylon Jones to be credible?
>
> [Investigator Lewis]: I'm not going to say, hard to believe, but I didn't think that it was entirely true, no, sir.

¶35.    At trial, Morton did not object to this line of questioning. "[I]t is well-settled law that the failure to make a contemporaneous objection waives the right of raising the issue on appeal." *Washington v. Kelsey*, 990 So. 2d 242, 247 (¶18) (Miss. Ct. App. 2008) (quoting *Lang v. State*, 931 So. 2d 689, 691 (¶11) (Miss. Ct. App. 2006)); *see* M.R.E. 103(a)(1).

Thus, this issue is procedurally barred.

### C. Improper-Bolstering Claim

¶36. Morton argues that the trial court erred by allowing the State to improperly bolster the credibility of its witness, Chapman, in the following testimony at trial:

[State]: What, if anything, have I told you about testifying?

[Chapman]: Nothing.

¶37. Morton argues that this improperly bolstered the State's case by asking Chapman, the codefendant, about any deals or hopes of a deal in exchange for testifying. Again, Morton failed to object to this question. Thus, the issue is procedurally barred. *Id.* Moreover, our supreme court has held that a leniency agreement with a State witness must be disclosed to the defense, and the defense must be allowed to present evidence of such an agreement to show bias or for impeachment purposes. *McCoy v. State*, 147 So. 3d 333, 349 (¶41) (Miss. 2014). Both the State and Morton's defense counsel questioned Chapman about any leniency deal she had made, to which she testified that there was none. This issue is without merit.

### D. Ineffective-Assistance-of-Counsel Claim

¶38. Morton asserts that he received constitutionally ineffective assistance of counsel, because his counsel failed to request a *Franks*[2] hearing on the validity of the search warrant. He argues that there was not sufficient probable cause to issue the search warrant, and the evidence found and recovered during the resulting search should have been excluded. Thus, he argues his counsel's representation was deficient.

---

[2] *Franks v. Delaware*, 438 U.S. 154 (1978).

16

¶39.     Again, an ineffective-assistance-of-counsel claim should only be addressed on direct appeal where "the record affirmatively shows ineffectiveness of constitutional dimensions." *Reed*, 204 So. 3d at 789 (¶16) (quoting *Johnson*, 196 So. 3d at 975 (¶7)).  "Where the record cannot support an ineffective-assistance-of-counsel claim on direct appeal, the appropriate conclusion is to deny relief, preserving the defendant's right to argue the same issue through a petition for [postconviction relief]." *Id*. (quoting *Johnson*, 196 So. 3d at 975 (¶8).

¶40.     "The legal standard for challenging a search[-]warrant affidavit is found in *Franks v. Delaware*, 438 U.S. 154 (1978)." *Russell v. State*, 73 So. 3d 542, 545 (¶10) (Miss. Ct. App. 2011) (citations omitted).  "Under *Franks*, a search warrant may be challenged if (a) the defendant makes a substantial preliminary showing that the affiant made a false statement knowingly and intentionally or with reckless disregard for the truth, and (b) the allegedly false statement was necessary to the finding of probable cause." *Id*. (citing *Franks*, 438 U.S. at 155-56).  "The defendant's claims must be more than conclusory." *Id*. (citing *Franks,* 438 U.S. at 171).

¶41.     Morton alleges that the search warrant was granted as the result of multiple untrustworthy statements given during the course of the investigation.  He fails to further specify what statements were false or untrustworthy or identify the sources.  Thus, his claims are merely conclusory.   Because the trial record does not validate Morton's ineffective-assistance-of-counsel claim, we decline to address the claim, in order to preserve Morton's right to argue the issue in a PCR motion.

**CONCLUSION**

17

¶42. For the foregoing reasons, we find that Morton's arguments lack merit, and we therefore affirm the circuit court's judgment on all of Morton's convictions and sentences.

¶43. **AFFIRMED.**

**IRVING AND GRIFFIS, P.JJ., BARNES, CARLTON, FAIR, WILSON, GREENLEE AND WESTBROOKS, JJ., CONCUR. TINDELL, J., NOT PARTICIPATING.**