# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-KA-01161-COA

**PRETZEA LOVE A/K/A PEREZ LOVE A/K/A PEREZEA LOVE**　　　　　　　**APPELLANT**

**v.**

**STATE OF MISSISSIPPI**　　　　　　　**APPELLEE**

DATE OF JUDGMENT:          06/02/2021
TRIAL JUDGE:               HON. BARRY W. FORD
COURT FROM WHICH APPEALED: HOLMES COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:    ARTHUR H. CALDERON
ATTORNEY FOR APPELLEE:     OFFICE OF THE ATTORNEY GENERAL
                           BY: CASEY B. FARMER
DISTRICT ATTORNEY:         AKILLIE MALONE OLIVER
NATURE OF THE CASE:        CRIMINAL - FELONY
DISPOSITION:               AFFIRMED IN PART; REVERSED AND
                           RENDERED IN PART - 10/31/2023
PETITION FOR REHEARING FILED:

**BEFORE WILSON, P.J., WESTBROOKS AND EMFINGER, JJ.**

**EMFINGER, J., FOR THE COURT:**

¶1.　From May 17 to 19, 2021, Pretzea Love a/k/a Perez Love a/k/a Perezea Love (Pretzea) was tried and convicted of capital murder, aggravated assault, possession of a firearm by a felon, and three counts of armed robbery in the Circuit Court of Holmes County, Mississippi. He was sentenced as a habitual offender pursuant to Mississippi Code Annotated section 99-19-81 (Rev. 2020). Pretzea appeals his convictions and sentences.

## FACTS

¶2.　A Holmes County grand jury returned a six-count indictment charging Pretzea Love, Demantreas Love, and Jamar Newsome with the capital murder of Vernardo Washington,

the aggravated assault of Joe Holmes, and the armed robberies of Clifton Holmes, Curtis Aldridge, and Vernardo Washington. Pretzea Love was also charged with possession of a firearm by a felon (Count V) and was charged as a habitual offender. Pretzea and Demantreas, who are brothers, were jointly tried, and Newsome testified at their trial as a State's witness.

¶3. The charges arose as the result of an incident that occurred just outside of Cruger, Mississippi, at Club CJ's. Curtis Aldridge and Melvin Waddell were co-owners of Club CJ's, which is located in Holmes County, Mississippi. The club had a bar and a cooler, shelves for storage, and a sink located behind the bar. There was a sixty-inch television behind the bar that lit up the area. A booth was built up so the disc jockey (DJ) could see over the crowd on the dance floor, which had a railing around it. Club CJ's had a pool table, which was used on the night of the incident for a dice game. There was an open seating area with tables and chairs. The events at issue occurred during the late evening hours of July 1, 2017, and the early morning hours of July 2, 2017. Aldridge opened the club at about 9:30 p.m. on July 1 to let the DJ, Vernardo Washington, set up his equipment. Washington was being paid to work a five-night run at the club, beginning that night. About 100 people came into the club that evening.

¶4. Joe Holmes ran the dice game for the club and helped Aldridge count the money at the end of the night. That night, there were sixteen to seventeen people shooting dice. Joe's cousin Clifton Holmes won about $1,200. Newsome, who had known the Love brothers (Pretzea and Demantreas) for over twenty years, testified that Demantreas lost between

2

$1,000 and $1,500. Newsome said that he did not come to the club with the Love brothers and that he stayed on the dance floor most of the night. However, other witnesses placed him at the dice game beside Demantreas during the evening. Pretzea, who was described as being about six feet, eight inches tall with long braids or dreadlocks, stood out in the crowd. Pretzea was the only person identified by the witnesses as possessing and shooting a firearm that night.

¶5.     Newsome testified that the Loves told him that "they was shooting dice and it went wrong and said folks took their money or whatever, and they was going to take their money back." They told Newsome they were going to take their money back when the club was closing. and the Loves told him they wanted him to be their lookout.

¶6.     According to Joe Holmes, the dice game ended around 3 a.m., and he started his closing routine. At that point, the crowd had died down, and there were only a few people inside the club. Newsome testified that after agreeing with the Loves that he would serve as a lookout, he re-entered the club and went to get some cigarettes. According to Newsome, as he was walking back from the bathroom, "they were coming in. Three of them went towards the bar and one of them went towards the DJ booth."[1] Several witnesses described the chaotic, fast-moving sequence of events that followed.

¶7.     Joe Holmes and Aldridge were behind the bar, at each end, getting ready to count the club's money from the evening. Clifton Holmes was sitting toward the middle of the bar

---

[1] Newsome's statement would seem to indicate at least two others acted in concert with the Loves, but he was never asked to identify the others involved or the four persons he saw "coming in."

counting his winnings. Aldridge testified that Pretzea came behind the bar where he was standing, pointed a gun at him, and told him to back away from the money. Aldridge backed away, lay down on the floor facing the wall, and started praying. Aldridge said Joe would not have been able to see Pretzea when Pretzea confronted Aldridge. Pretzea then continued along the bar and confronted Clifton. He pointed the gun at Clifton and demanded his money. Clifton gave Pretzea his money and then dropped to his knees. Pretzea then continued to the other end of the bar, pointed the gun at Joe's head, and demanded that Joe give him the money. Joe gave him the money and immediately jumped over the bar to get away from Pretzea.

¶8.    When Joe jumped over the bar, he landed on Demantreas. During the process, Pretzea shot Joe in his right side. As Pretzea tried to get Joe off his brother, Demantreas was telling Pretzea to "shoot him, shoot him, finish him, go on and shoot him." When Pretzea got Joe off Demantreas, Pretzea "shot him some more and shot towards where the DJ was." Newsome testified he saw someone struggling with Washington and that he saw Pretzea shoot Washington. Newsome and the Love brothers fled in separate vehicles.

¶9.    From his position on the floor facing the wall, Aldridge could not see anything, but he heard a commotion and three rounds of gunshots: "The first round was like three or four shots. And the next time, it was like three or four shots. And the next time, it was like six to eight shots." Aldridge said he lay on the floor for about three minutes and then got up because he was not hearing anything. Aldridge stated that he first made sure everyone was out of the club and then walked to the end of the bar where he saw Washington lying face

4

down on the floor. Clifton told Aldridge that Washington was "gone." Aldridge did not see Joe until he went outside and discovered that Joe had also been shot. Aldridge called his wife and told her to call 911 and Washington's family.

¶10. Washington's family took him to the hospital before an ambulance arrived. Washington had six gunshot wounds, with the lethal wound being a close-contact wound under his armpit that traveled through a rib and his left lung.[2] Joe Holmes was taken to the local hospital. He was later transferred to the University of Mississippi Medical Center in Jackson. Joe was in the hospital for about three weeks and testified that it took him about six months to recover from his gunshot wound.

¶11. At the conclusion of the trial, Pretzea was found guilty of all six counts. He was sentenced as a habitual offender to a term of life imprisonment without eligibility for parole in the custody of the Mississippi Department of Corrections for capital murder, as charged in Count I; to a term of twenty years in custody for aggravated assault, as charged in Count II; to a term of thirty years in custody for the armed robbery of Clifton Holmes, as charged in Count III; to a term of ten years in custody for possession of a firearm by a convicted felon, as charged in Count V; and to a term of thirty years in custody for the armed robbery of Vernardo Washington, as charged in Count VI. The sentences for Counts I, II, and V were ordered to run concurrently with one another. The sentences for Counts III and VI were ordered to run concurrently with one another but consecutively to the sentences for Counts

---

[2] Dr. Jay Davis, who was no longer available to testify at trial, performed the autopsy of Vernardo Washington's body. Dr. Frank Peretti was accepted as an expert in the field of forensic pathology. Dr. Peretti testified that he reviewed the complete file of Dr. Davis and formed his own opinions as to the cause and manner of Washington's death.

I, II, and V. As will be discussed below, the conviction for the armed robbery of Curtis Aldridge, as charged in Count IV, was merged with the capital murder conviction (Count I) as the underlying felony.

**ANALYSIS**

¶12. Pretzea raises four main issues on appeal, which we address below.[3]

> **I.** **Pretzea contends that the evidence was not legally sufficient to support the conviction of armed robbery in Count VI.**

¶13. Pretzea first contends that "the State offered no proof that Vernardo Washington was the victim of an armed robbery." He argues that neither Newsome nor any other witness "ever testified that they observed Pretzea take or attempt to take any money (or other property) from Washington." He argues because there was no proof of this essential element of the crime of armed robbery, the evidence was legally insufficient.

¶14. We set forth our standard of review for a challenge to the legal sufficiency of the evidence in *Alvarado v. State*, 343 So. 3d 391, 396 (¶10) (Miss. Ct. App. 2022):

> "In reviewing a challenge to the legal sufficiency of the evidence, we consider all of the evidence in the light most favorable to the prosecution and accept all evidence supporting the verdict as true." *Dampeer v. State*, 989 So. 2d 462, 464 (¶7) (Miss. Ct. App. 2008). We then determine, based on the evidence, whether reasonable, fair-minded jurors could have found the defendant guilty. *Goldman v. State*, 406 So. 2d 816, 819 (Miss. 1981). That is, "whether a reasonable juror could rationally say that the State" "proved each element of the crime." *Lenoir v. State*, 222 So. 3d 273, 279 (¶25) (Miss. 2017) (citing *Poole v. State*, 46 So. 3d 290, 293-94 (¶10) (Miss. 2010)).

¶15. In *Jones v. State*, 281 So. 3d 137, 146 (¶26) (Miss. Ct. App. 2019), we stated:

---

[3] Pretzea does not challenge his convictions for aggravated assault in Count II and possession of a firearm by a felon in Count V or his status as a habitual offender pursuant to section 99-19-81.

6

"The essential elements of armed robbery are: (1) a felonious taking or attempt to take, (2) from the person or from the presence, (3) the personal property of another, (4) against his will, (5) by violence to his person or by putting such person in fear of immediate injury to his person by the exhibition of a deadly weapon." *Oliver v. State*, 234 So. 3d 443, 445 (¶11) (Miss. Ct. App. 2017), *cert. denied*, 233 So. 3d 822 (Miss. 2018).

Count VI of the indictment, as amended, charged as follows:[4]

[Pretzea] on or about the 2nd day of July, 2017, in Holmes County, Mississippi did unlawfully and feloniously aid and abed [sic] to take from Vernardo Washington property, United States currency, from his person against his will by violence and put Vernardo Washington in fear of immediate injury by the exhibition of a firearm, in violation of Section 97-3-79 of the Mississippi Code of 1972, as amended, against the peace and dignity of the State of Mississippi.

¶16. The jury instruction as to Count VI read, in part, that Pretzea, acting in concert with others,

did unlawfully, willfully and feloniously take and carry away from the person of or from the presence of Vernardo Washington, certain personal property, to wit: good and lawful U.S. Currency or any property of Vernardo Washington . . . .

¶17. According to Newsome and the other eyewitnesses, it is clear that the Loves' plan was to come back into the club at closing and steal money. Based upon Newsome's testimony noted above, the Loves may have had others acting in concert with them. Newsome testified that when they came in, three of them went toward the bar, and one of them went toward the

---

[4] Prior to trial, Count VI was amended to remove (as surplus language) a reference to "Lexington, Mississippi." Count VI was also amended to replace the name of "Clifton Holmes" with the name "Vernardo Washington," where Washington had been identified as the victim earlier in the count. The indictment originally included in the appellate record contained an erroneous third page upon which Count VI purportedly concluded. Upon order of this Court, the trial court provided the full, true, and correct copy of the indictment to supplement the record, which included the correct final page of the indictment.

DJ booth. Later he saw "the DJ scuffling with another person." There was a reasonable inference from the evidence that during the struggle, Washington suffered a close-contact gunshot wound that caused his death. However, there is no evidence that any of *Washington's* property was taken.

¶18. The jury instruction differs from the indicted charge in some respects. While the indictment charged that the property was taken from Washington's person, the instruction added the statutory language "or from the presence" of Washington. Further, while the indictment does not specifically identify the ownership of the property taken, the instruction requires the jury to find beyond a reasonable doubt that it was *Washington's* property that was actually taken.

¶19. In *Morton v. State*, 246 So. 3d 895, 904 (¶24) (Miss. Ct. App. 2017), this Court explained:

> "[I]n Mississippi both an attempt to take and an actual taking of another's personal property against his will by violence to his person or by putting such person in fear of immediate injury to his person by the exhibition of a deadly weapon constitutes robbery." *Houston v. State*, 811 So. 2d 371, 372 (¶4) (Miss. Ct. App. 2001) (quoting *Harris v. State*, 445 So. 2d 1369, 1370 (Miss. 1984)).

While the State could have charged Pretzea with armed robbery by "attempting to take" Washington's property, neither the indictment nor the instruction gave the jury that option.

¶20. The State argues that this case is similar to other cases where a business was being robbed, and multiple employees were present during the robbery. In *Reynolds v. State*, 227 So. 3d 428, 436 (¶34) (Miss. Ct. App. 2017), this Court stated:

> In *Towner v. State*, 812 So. 2d 1109 (Miss. Ct. App. 2002), this Court addressed a similar scenario of a defendant convicted of two counts of armed

8

robbery after he took a single sum of money that belonged to one business. Towner robbed an employee and one of the owners of Toucan's restaurant in Gulfport by holding the two women at gunpoint, ordering them into the restaurant's office, and demanding about $2,000 that was on the desk, in money bags, and in a register drawer. *Id*. at 1110-11 (¶¶1-4). On appeal, Towner argued "that since the property taken from each victim was the identical property," there could "be only one robbery." *Id*. at 1113 (¶16). In rejecting Towner's argument, this Court first held that under the plain language of the robbery statute, Miss. Code Ann. § 97-3-79 (Rev. 2014), ownership of the property taken is unimportant; what the State must prove is that property was taken from the person or presence of the victim. *See Towner*, 812 So. 2d at 1113 (¶18). We held that "[r]obbing two people of one item of property at gunpoint **while the property is within their proximity and control**, even if neither of them owns it, may be two robberies." *Id*. at 1114 (¶23). This is because a robbery is a crime against a specific person—unlike larceny, which is a crime against specific property. *Id*.

(Emphasis added). According to the State, Washington was an employee of Club CJ;[5] therefore, the taking of Club CJ's money from Aldridge is sufficient to support his conviction of armed robbery. However, this argument ignores that the indictment charged that the property was taken from the "person" of Washington, and the jury instruction required the jury to find that *Washington's* property was taken, not the club's property. Because there was no evidence from which a reasonable and fair-minded juror could have found beyond a reasonable doubt that any of Washington's property was taken, the armed robbery conviction in Count VI is reversed and rendered.

> **II.    Pretzea contends that because Count IV was fundamentally flawed and because the State relied on it to secure a conviction for capital murder, we should reverse his convictions of Counts I and IV.**

---

[5] In *Reynolds* and *Towner*, the victims were actual employees who had some responsibility for or "control" of the funds that were taken. *Reynolds*, 227 So. 3d at 436 (¶34); *Towner*, 812 So. 2d at 1114 (¶23). Here, Washington had been hired as a DJ for five nights. There is no evidence that he was given any responsibility for (or **control** over) the club's money.

¶21.    Pretzea argues that Count IV of the indictment was fundamentally flawed because it alleged that a business—not a natural person—was the victim of armed robbery. Citing *Burks v. State*, 770 So. 2d 960, 963 (¶12) (Miss. 2000), Pretzea contends that "the identity of the victim is an essential element of a robbery charge." Because the victim was not properly identified in Count IV of the indictment, he contends his conviction of that count should be reversed.

¶22.    Pretzea was found guilty of capital murder as charged in Count I, with the underlying felony being the armed robbery of Curtis Aldridge, and he was found guilty of the armed robbery of Curtis Aldridge as charged in Count IV. At sentencing, the trial judge merged the conviction for armed robbery in Count IV with the capital murder conviction in Count I. The "Jury Verdict and Sentencing" order reads, in part:

> Count IV Armed Robbery shall be merged with Count I due to Count IV being the underlying felony to Count I . . . .

This merger complied with the supreme court's direction in *McGlasten v. State*, 328 So. 3d 101, 108 (¶29) (Miss. 2021):

> The correct and widely followed approach to dealing with multiplicitous counts is to merge the wrongly charged multiplicitous counts into one single count of conviction.

Because there is no conviction for armed robbery (Count IV), the issue of whether the indictment for Count IV was "fundamentally flawed" is moot.

¶23.    Pretzea further contends, however, that because of this alleged defect in Count IV of the indictment, his conviction of capital murder in Count I should be reversed. He does not challenge the form of the indictment for capital murder in Count I. He does not challenge the

sufficiency of the instruction given to the jury as to capital murder. He does not challenge the sufficiency of the evidence to support his conviction for capital murder. He does not cite any authority to support his contention that a defect in Count IV of the indictment requires a reversal of an otherwise proper conviction of the charge in Count I of the indictment.

¶24. In any event, Count I of the amended indictment charged as follows:

> [Pretzea Love] on or about the 2nd day of July, 2017, in Holmes County, Mississippi, did unlawfully, feloniously, willfully, and maliciously aid and abed [sic] without authority of law and with or without deliberate design to effect death, kill and murder Vernardo Washington, a human being, while engaged in an armed robbery, while in [Cruger], Mississippi, in violation of Section 97-3-19(2)(e) of the Mississippi Code of 1972, as amended, which offense is punishable by death or by imprisonment for life and against the peace and dignity of the State of Mississippi.

¶25. Concerning our standard of review regarding a challenge to the sufficiency of an indictment charging capital murder, the supreme court explained in *Carson v. State*, 212 So. 3d 22, 31 (¶¶34-36) (Miss. 2016):

> The sufficiency of an indictment is a question of law, and therefore is reviewed de novo. *Berry v. State*, 996 So. 2d 782, 785-86 (¶8) (Miss. 2008) (quoting *Quang Thanh Tran v. State*, 962 So. 2d 1237, 1240 (Miss. 2007)). "So long as a fair reading of the indictment, taken as a whole, clearly describes the nature and cause of the charge against the accused, the indictment is legally sufficient." *Farris v. State*, 764 So. 2d 411, 421 (¶28) (Miss. 2000) (citing *Harrison v. State*, 722 So. 2d 681, 687 (Miss. 1998)).
>
> . . . A criminal defendant has a constitutional right "to be informed of the nature and cause of the accusation[ ]" against him. U.S. Const. amend. IV; *see also* Miss. Const. art 3, § 26 (1890). **An indictment which tracks the language of the criminal statute is sufficient to place the defendant on notice of the charge against him.** *Batiste* [*v. State*], 121 So. 3d [808,] 836 (¶43) [(Miss. 2013)] (citing *Stevens v. State*, 808 So. 2d 908, [919] [(¶31)] (Miss. 2002)). **Regarding capital-murder cases**, for which both Batiste and Carson were charged, **"unless the underlying felony is burglary, 'the underlying felony that elevates the crime to capital murder must be**

11

**identified in the indictment along with the section and subsection of the statute under which the defendant is being charged.' . . . No further detail is required."** *Id.* (quoting *Goff v. State*, 14 So. 3d 625, 665 [(¶176)] (Miss. 2009); Miss. Code Ann. § 99-17-20).

(Emphasis added).

¶26. In *Green v. State*, 235 So. 3d 1438, 1440 (¶6) (Miss. Ct. App. 2017), this Court applied the holding in *Carson* and noted:

> Furthermore, the attack on the capital murder indictment is based on *Rowland v. State*, 98 So. 3d 1032, 1038-39 (¶12) (Miss. 2012), which had held that a capital murder indictment must name the victim of the underlying felony. But *Rowland* was overruled on that point by *Carson v. State*, 212 So. 3d 22, 32-34 (¶¶37-40) (Miss. 2016). The identity of the victim of the underlying crime is not an element of capital murder. *Id.* Thus, Green's indictment did not fail to allege an essential element of either capital murder count.

Although Count I of the indictment did not name Curtis Aldridge as the victim of the underlying armed robbery, we find that Count I of the indictment was legally sufficient to charge Pretzea with capital murder.

¶27. While it was not necessary that the elements of armed robbery be included in the indictment, the jury must be instructed as to the elements of armed robbery, including the name of the alleged victim. *Waldrop v. State*, 247 So. 3d 364, 366 (¶¶6-10) (Miss. Ct. App. 2018). That was done in this case. We find the indictment, the jury instruction, and the evidence was sufficient to support Pretzea's conviction of capital murder as charged in Count I.

> **III. Pretzea contends an armed robbery charge in one count that encompasses all employees renders a separate armed robbery count against an individual employee multiplicitous.**

¶28. In his third assignment of error, Pretzea contends that his convictions for armed

12

robberies in Counts IV and VI, pursuant to *McGlasten*, 328 So. 3d at 108 (¶29), should be merged into one single count of conviction. However, as noted above, his conviction as to Count VI is reversed and rendered, and the jury's verdict as to Count IV was merged into Pretzea's conviction for capital murder in Count I. This issue is moot.

### IV. Pretzea contends that double jeopardy prohibits a conviction for capital murder and the underlying armed robbery counts.

¶29. In this final assignment of error, Pretzea contends that "Count I's charge of capital murder put Love in jeopardy for armed robbery as to *all of the alleged victims*, such that the armed robbery—regardless of the alleged victim—was treated as one continuous transaction and a constituent element of the capital murder charge." (Footnote omitted). Accordingly, he argues that each armed robbery count is a lesser-included offense of capital murder in Count I and cannot be separately punished simultaneously or consecutively. In support of his argument, Pretzea cites the familiar "same-elements" test established by the United States Supreme Court in *Blockburger v. United States*, 284 U.S. 299, 304 (1932), and the "one-continuous-transaction" rule discussed by the Mississippi Supreme Court in *Batiste v. State*, 121 So. 3d 808, 831-33 (¶¶31-35) (Miss. 2013).

¶30. In *Batiste*, the defendant argued:

> Batiste stated in his confession that he killed Galanis during a fight, left the apartment for approximately an hour and a half, and then returned and began his clean-up effort. During the clean-up effort, he removed Galanis's wallet and other personal items. Other evidence showed that Batiste used Galanis's cash and credit card to purchase cleaning supplies with which to conceal the crime. Batiste argues that this evidence showed that he was guilty of deliberate-design murder because, at the time he killed Galanis, he had lacked the intent to rob him, and that he was entitled to jury instructions to that effect.

13

*Id.* at 831 (¶31). The court found that the trial jury was properly instructed as to the one-continuous-transaction rule as follows:

> The Court instructs the jury that the phrase 'while engaged in the commission of' includes the attempt to commit the crime, the completed crime, as well as the immediate post-crime acts of the defendant so connected to the homicide as to become a part of it.

*Id.* at 833 (¶35). Thus, this rule is used for "determining whether the evidence establishes the requisite nexus between the killing and the underlying felony to constitute capital murder." *Id.* at 831 (¶33). As such, it has no application to Pretzea's double jeopardy argument.

¶31.    In *Pope v. State*, 330 So. 3d 409, 428 (¶97) (Miss. Ct. App. 2021), we stated:

> "We employ the *Blockburger* test to determine whether a double-jeopardy violation has occurred; it asks whether each offense contains an element not present in the other." *McDonald v. State*, 204 So. 3d 780, 782 (¶6) (Miss. Ct. App. 2016) (citing *Blockburger v. United States*, 284 U.S. 299 (1932)). Multiple convictions of the same felony do not violate the Double Jeopardy Clause where each charge was for a separate victim. *Id.* at 783 (¶7). In other words, each victim served as an element of one offense not present in the other.

¶32.    Further, in *Washington v. State*, 158 So. 3d 1246, 1251 (¶12) (Miss. Ct. App. 2015), we stated:

> This Court has held that separate offenses, though committed under a common nucleus of operative fact, do not present a legal impediment to multiple prosecutions under the double jeopardy clause of both the federal and the state constitutions.

¶33.    The three armed robbery charges and convictions involved separate victims. The evidence further shows that they all occurred during a "common nucleus of operative fact." In any event, the conviction for the armed robbery of Aldridge in Count IV was merged with the capital murder conviction in Count I. The conviction for the armed robbery of

14

Washington in Count VI is reversed and rendered, as set forth above. Thus, Pretzea has only one conviction for armed robbery, that being the armed robbery of Clifton Holmes in Count III. Further, as for his capital murder conviction in Count I, Washington was the victim of the murder, and Aldridge was the victim of the armed robbery used as the underlying felony. Count I and Count III each had different victims. This assignment of error therefore fails.

## CONCLUSION

¶34. Based upon the above, we affirm Pretzea's convictions and sentences except his conviction of armed robbery as charged in Count VI, which we reverse and render.

¶35. **AFFIRMED IN PART; REVERSED AND RENDERED IN PART.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND SMITH, JJ., CONCUR.**