# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-KA-01383-COA

JAMALTAE ADAMS A/K/A JAMALTAL ADAMS          APPELLANT

v.

STATE OF MISSISSIPPI          APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 10/16/2020 |
| TRIAL JUDGE: | HON. GRADY FRANKLIN TOLLISON III |
| COURT FROM WHICH APPEALED: | LAFAYETTE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: W. DANIEL HINCHCLIFF |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: CANDICE LEIGH RUCKER |
| DISTRICT ATTORNEY: | BENJAMIN F. CREEKMORE |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 05/03/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WILSON, P.J., GREENLEE AND EMFINGER, JJ.**

**WILSON, P.J., FOR THE COURT:**

¶1. Jamaltae Adams was convicted of armed robbery following a jury trial in the Lafayette County Circuit Court. On appeal, Adams argues that the jury's verdict was against the overwhelming weight of the evidence, that the State improperly used a codefendant's guilty plea and recorded interview during trial, and that his indictment was defective. He also argues that cumulative error entitles him to a new trial. After review, we find no reversible error and affirm Adams's conviction and sentence.

## FACTS AND PROCEDURAL HISTORY

¶2.     A little before 10:30 p.m. on August 29, 2016, Justin Wilson and his sister Amanda witnessed an apparent robbery at the Molly Barr Trails Apartments in Oxford. Two or more black males wearing black or black-and-white masks or bandanas over their faces were standing over a car in the parking lot and appeared to be robbing the car's occupants. Amanda called 911 and reported that the robbers had left in a silver Mustang with one working headlight. They were driving in the direction of "Three Way," a grocery store/intersection near the apartments.

¶3.     Lieutenant Steve Lewis of the Oxford Police Department received a call about the robbery and was given a description of the suspect's vehicle. While driving toward Three Way, Lewis saw a car matching the description and initiated a traffic stop. Additional officers responded to provide backup. Brannon McAllister was driving the car, Jamaltae Adams was in the passenger seat, and Laterrance Lindsey was in the backseat. The officers recovered a black revolver, several cell phones, and black-and-white bandanas from the car. Adams was wearing a gold watch and had a bag of marijuana inside his pants.

¶4.     Alisha Smith testified that she had become acquainted with Adams through social media. On August 29, Smith and some of her friends "chill[ed]" with Adams at the Campus Walk Apartments in Oxford for about two hours. That evening, Adams called Smith from a gas station and asked her to give him a ride to the Molly Barr Trails Apartments to meet some of his friends. Smith and her friend Deandre "Boosie" Parker picked up Adams at the gas station and drove to the apartments. When they arrived, Adams directed Smith to park in a specific area of the parking lot. Adams then called one of his friends to tell him where

2

they were parked. About two minutes later, two men ran up to Smith's car, one on the driver's side and one on the passenger's side. The men were wearing bandanas, and the man on the passenger's side had a gun. The men started yelling at Smith, Parker, and Adams to give them everything they had. Smith gave the men her phone, and Parker gave the men his phone and "a bag of something." The robbers also took Adams's gold watch.

¶5. When the robbery began, Adams was in the backseat of Smith's two-door car. Smith testified that after Adams surrendered his watch, Adams started pushing on the back of Parker's seat as if he wanted to get out of the car. Smith testified that the armed robber was still pointing a gun at the car while Adams was trying to exit the car. She testified that Adams got out of the car, and he and the two robbers all ran away in the same direction.

¶6. Smith testified that once the robbery ended, she drove away as quickly as possible to take Parker home. She said that she wanted to go to the police station, but Parker insisted that she take him home first. A police officer stopped them because Smith's car coincidentally matched the description of the suspects' silver Mustang. The officer asked Smith if she had been involved in a robbery, and she explained she was the victim. About that time, the officer was notified that other officers had apprehended the suspects.

¶7. The State called Laterrance Lindsey as a witness at trial. Lindsey acknowledged that he, Brannon McAllister, and Adams had been charged with the armed robbery and that he (Lindsey) had pled guilty to the crime. When the prosecutor began questioning Lindsey about the events leading up to the robbery, Lindsey stated that he "would like to talk to [the prosecutor] one on one" because he did not have "a full understanding of why" he had been

3

called to testify. The trial judge then declared a recess. In chambers, Lindsey asked if he was required to testify or if it was "optional." Lindsey explained that testifying against Adams was "not a good thing" for him because he (Lindsey) was in prison. The prosecutor pointed out that Lindsey no longer had a Fifth Amendment privilege with respect to the armed robbery because he had already pled guilty to that crime, and Lindsey ultimately resumed his testimony in open court before the jury.

¶8.     Lindsey admitted that on August 29, 2016, he had driven from Tupelo to Oxford with Adams and McAllister. Lindsey also admitted that he had gone to the Molly Barr Trails Apartments that night. Lindsey denied that he discussed a robbery with Adams or McAllister "[b]efore [they] came to Oxford." However, Lindsey admitted that he committed the robbery at issue in this case, and he admitted that he, McAllister, and Adams all ended up in McAllister's car after the robbery. Lindsey refused to answer when the prosecutor asked him whether he and Adams "ran away from the car where the robbery took place . . . at or about the same time to go back to [McAllister's] car."

¶9.     Detective Shane Fortner interviewed Adams the night of the robbery and again ten days later. Prior to both interviews, Fortner advised Adams of his *Miranda* rights, which Adams waived. Recordings of the interviews were played at trial.

¶10.    In the first interview, Adams maintained that he was a victim of the robbery. He said that he and some friends from Tupelo (McAllister and Lindsey) had driven to Oxford that afternoon and that his friends dropped him off at an apartment complex. Adams said that he eventually ended up "chilling" with Smith, who said she knew a man who could sell them

4

marijuana. Adams stated that he and Smith met the man (Parker) at a gas station, but Parker was not comfortable there, so they drove to the Molly Barr Trails Apartments. Adams said that Parker was about to sell him marijuana when two men ran up to the car and robbed them. Adams said he could not see the robbers' faces because they were "masked up." He stated that one of the robbers pulled him out of the car and took his gold watch and marijuana, and both robbers then ran away. Adams said that as soon as the robbery ended, Smith and Parker drove away fast in Smith's car, leaving him in the parking lot. Adams said that the robbers must have dropped his watch and marijuana because he found them on the ground nearby. Adams stated that he called McAllister and Lindsey and told them that he had just been robbed. Adams "dropped a pin" to give them his location, and they arrived to pick him up three or four minutes later. Adams got in their car. Adams said his friends did not say anything about a robbery and were only interested in smoking his marijuana. He said that a few minutes later, the police pulled them over. Adams stated that he never called 911 because he did not want to get the police involved.

¶11. In the second interview, on September 8, Adams told Fortner that the story he gave during his first interview was not true. Adams told Fortner that on August 29, McAllister had called him looking for marijuana. Adams told McAllister that he bought marijuana from Parker, who lived in Oxford. When Adams told McAllister the price that Parker charged, McAllister said he wanted to rob Parker and take his marijuana. According to Adams, he told McAllister that he could not do that. Adams said that McAllister then stated that he would "go see [Adams's] mama" if Adams did not help him rob Parker. Adams said that he

5

took this as a serious threat because he knew McAllister was a "real killer." Adams said that he then agreed to help, and McAllister and Lindsey arrived at his home in Tupelo about an hour later. Adams got in the car with them, and they drove to Oxford.

¶12. Adams stated that when they were about ten minutes outside of Oxford, McAllister instructed him to "hit up" Parker. According to Adams, Parker said that he was "out of pocket" and would call them back later, so Adams, McAllister, and Lindsey all went to Adams's friend's apartment to "chill." Adams stated that about two or three hours later, Parker called him back and agreed to meet him. However, Parker insisted that Adams had to come alone. Adams said that when he told McAllister and Lindsey what Parker had said, McAllister said they would follow Adams. Adams stated that Smith and Parker picked him up, and after stopping at a gas station, they drove to the Molly Barr Trails Apartments. As they were sitting in the car in the parking lot of the apartments, McAllister and Lindsey ran up suddenly and robbed them. Adams said McAllister pulled him out of the car during the robbery. Adams stated that after McAllister and Lindsey ran away, Smith and Parker drove away fast, leaving him at the apartments. Adams ran after McAllister and Lindsey and joined them at McAllister's car. They all got in the car and left, and the police pulled them over a few minutes later. Adams stated that McAllister tossed him the stolen marijuana just before they were pulled over. Adams claimed he participated in the robbery under duress because of McAllister's threat against his mother.[1]

¶13. Detective Fortner testified that he had also interviewed Lindsey twice—first on the

---

[1] At trial, the jury was instructed on the defense of duress.

night of the robbery and again three days later. Fortner recorded both interviews. Prior to both interviews, Fortner advised Lindsey of his *Miranda* rights, which Lindsey waived. Parts of the second interview were played during the State's direct examination of Fortner. On cross-examination, Adams's lawyer played parts of both interviews. Following Fortner's testimony, the State moved to admit the disc containing the full recordings of both interviews, and Adams's lawyer stated that he had "[n]o objection."

¶14. During the first interview, Lindsey denied that he played any part in a robbery. However, during the second interview, Lindsey admitted that "[w]e stole some weed, basically." He also admitted that he took Smith's and Parker's phones. Lindsey denied that he had a gun, but he admitted that McAllister had been carrying a gun "all day." Lindsey stated that he and McAllister knew that Adams and Smith were meeting someone to buy marijuana, so they followed them to the Molly Barr Trails Apartments and robbed them. Lindsey said that after the robbery, Adams ran after him and McAllister and got in the car with them. Fortner repeatedly asked Lindsey whether Adams had "set up" the robbery, but Lindsey denied that there was a "set up."

¶15. On cross-examination, Fortner acknowledged that he had asked Lindsey several times if Adams had set up the robbery, and Lindsey denied it each time. Fortner also acknowledged that the robbery appeared to have occurred during a marijuana sale involving Smith or Parker, but he did not attempt to investigate the marijuana sale.

¶16. Adams, McAllister, and Lindsey were indicted for armed robbery. Adams was tried separately. At the close of the State's case, the trial judge denied Adams's motion for a

7

directed verdict. Adams did not testify or call any witnesses. The jury found Adams guilty of armed robbery, and the trial judge sentenced him to thirty years in the custody of the Department of Corrections, with ten years suspended and twenty years to serve. Adams filed a motion for a new trial or judgment notwithstanding the verdict (JNOV), which was denied by operation of law, and a notice of appeal. On appeal, Adams argues that the jury's verdict is against the overwhelming weight of the evidence; that the State improperly used Lindsey's guilty plea and recorded interview during trial; and that his indictment was defective and was never properly amended. Adams also argues that he is entitled to a new trial based on the cumulative error doctrine.

**ANALYSIS**

**I.     The jury's verdict was not against the overwhelming weight of the evidence.**

¶17.   When we review a claim that a defendant is entitled to a new trial because the jury's verdict is against the weight of the evidence,

> [w]e do not reweigh evidence. We do not assess the witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury. Our role as [an] appellate court is to view the evidence in the light most favorable to the verdict and disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.

*Little v. State*, 233 So. 3d 288, 289 (¶1) (Miss. 2017).

¶18.   In this case, we cannot say that the jury's verdict was "contrary to the overwhelming weight of the evidence." *Id.* In his second interview, Adams admitted that he participated in the planning and execution of the robbery. Although Adams claimed he was under duress,

he admitted that he hurried to rejoin McAllister and Lindsey immediately after the robbery, and he was apprehended minutes later in possession of his watch and the stolen marijuana. There was sufficient evidence for the jury to find that Adams set up and participated in the robbery willingly, and there was no "overwhelming" evidence to the contrary. *Id.* Accordingly, this issue is without merit.

## II.     Lindsey's testimony that he pled guilty was not plain error.

¶19.    As noted above, the State began its examination of Lindsey by asking whether he had pled guilty to the armed robbery. Adams did not object to the State's questions, and Lindsey acknowledged his guilty plea. On appeal, Adams argues that the trial judge committed "plain error" by allowing Lindsey to testify that he had pled guilty.[2]

¶20.    As our Supreme Court has stated, "We do not consider matters on appeal that were not placed first before the trial judge for decision. A trial judge cannot be put in error on a matter which was not placed before him for decision." *Terry v. State*, 324 So. 3d 753, 757 (¶16) (Miss. 2021) (quoting *Duplantis v. State*, 708 So. 2d 1327, 1339 (¶49) (Miss. 1998)). Therefore, Adams waived this issue by failing to object at trial.

¶21.    In addition, reversal is not warranted under the plain-error doctrine. "Plain-error review is properly utilized for correcting *obvious* instances of injustice or misapplied law." *Green v. State*, 183 So. 3d 28, 31 (¶6) (Miss. 2016) (quotation marks omitted). Therefore, "in order to determine if plain error has occurred, we must determine if the trial court has

---

[2] Adams uses the term "plain error" in the argument heading of his appellate brief, but he never expressly acknowledges his failure to object at trial, nor does he develop an argument under the plain-error doctrine.

deviated from a legal rule" and "whether that error is plain, clear, or obvious." *Id.* (brackets and quotation marks omitted).

¶22.    Here, there was no "plain, clear, or obvious" error. *Id.* (brackets omitted).  Evidence of a "co-defendant's guilty plea or conviction is generally inadmissible 'because such plea of guilty or conviction is no evidence of the guilt of the party being tried.'" *Harper v. State*, 102 So. 3d 1154, 1161 (¶25) (Miss. Ct. App. 2012) (quoting *Buckley v. State*, 223 So. 2d 524, 528 (Miss. 1969)).  However, "a defendant's opportunity to question a co-indictee regarding his or her guilty plea weighs against a finding of error regarding the admission of evidence regarding those same guilty pleas." *Id.* at 1161-62 (¶26) (citing *Palm v. State*, 724 So. 3d 424, 426 (¶4) (Miss. Ct. App. 1998)).  In addition, our Supreme Court has recognized that evidence of a witness's guilty plea does not involve the same "danger" as evidence that a "witness had been tried by a jury and found guilty of the same crime for which the defendant [is] being tried." *Clemons v. State*, 732 So. 2d 883, 890 (¶29) (Miss. 1999)).  Evidence of a prior jury verdict creates a danger that the present jury will "rely upon the judgment of a prior jury in reaching its decision." *Id.*  In contrast, evidence of a witness's guilty plea may simply be "consistent with the [witness's] testimony at trial." *Id.*  Here, Adams was able to cross-examine Lindsey, and Lindsey's guilty plea was consistent with his own testimony and other evidence showing that he was guilty of armed robbery.  Accordingly, it is far from "plain, clear, or obvious" that the State's question to Lindsey was improper. *Green*, 183 So. 3d at 31 (¶6).

¶23.    Moreover, no "legal rule" required the trial judge to act sua sponte to exclude

10

Lindsey's testimony in the absence of an objection by Adams. *Green*, 183 So. 3d at 31 (¶6); *cf. Demorst v. State*, 228 So. 3d 323, 328 (¶9) (Miss. Ct. App. 2017) (stating that the admissibility of identification testimony was "particularly unsuited for plain error review" because "we are aware of no legal rule requiring a trial court to sua sponte suppress evidence"). In general, "[w]hether to object is a decision left to the discretion of counsel, who may have strategic reasons for not objecting." *Graham v. State*, 264 So. 3d 819, 821 (¶8) (Miss. Ct. App. 2018) (quoting *Shaheed v. State*, 205 So. 3d 1105, 1112 (¶21) (Miss. Ct. App. 2016)). That appears to be exactly what occurred in this case. As we discuss further *infra*, Adams's trial counsel relied on Lindsey's statement to police and Lindsey's guilty plea. In his closing argument, defense counsel emphasized that although Lindsey had pled guilty and admitted his own guilt, Lindsey repeatedly refused to implicate Adams in the crime. Based on the record, it appears that counsel made a strategic decision not to object to evidence of Lindsey's guilty plea. *See Brown v. State*, 37 So. 3d 1205, 1213 (¶20) (Miss. Ct. App. 2009) (concluding that trial counsel's decision "not to object to evidence of [a codefendant's] guilty plea[] constituted trial strategy"—not "plain error"). No "legal rule" required the trial judge to act sua sponte to prevent such testimony. *Shaheed*, 205 So. 3d at 1112 (¶21) (quoting *Green*, 183 So. 3d at 31 (¶6)).

¶24. Finally, "[f]or the plain-error doctrine to apply, there must have been an error that resulted in a manifest miscarriage of justice or seriously affects the fairness, integrity or public reputation of judicial proceedings." *Hall v. State*, 201 So. 3d 424, 428 (¶12) (Miss. 2016) (brackets and quotation marks omitted). Here, Adams cannot make such a showing.

11

Rather, Lindsey's guilty plea was simply consistent with Lindsey's testimony and the other evidence at trial. Adams cannot show that he was prejudiced; indeed, Adams made strategic use of Lindsey's guilty plea in his arguments to the jury. Thus, for all the foregoing reasons, the trial judge did not err—let alone commit a plain or clear error—by not acting sua sponte to prevent Lindsey from testifying about his guilty plea.

### III. The trial judge did not err by allowing Lindsey's recorded interview to be played at trial.

¶25. As discussed above, during Fortner's direct examination, the State played parts of Fortner's second interview of Lindsey. In addition, during Fortner's cross-examination, Adams's trial counsel played parts of Fortner's first and second interviews of Lindsey. Finally, following Fortner's testimony, the disc containing the full recordings of both interviews was admitted into evidence with "[n]o objection" by Adams. At trial, Adams raised only one objection related to the interviews. When the State first played part of Lindsey's second interview, Adams's trial counsel stated:

> I would object in the sense that, you know, if this is an interview with Mr. Lindsey he was present here earlier. I obviously don't have the turn to cross him [on the interview]. I would make that objection if it is something if he could be brought back if I needed to that would be the court's discretion but I do have to point out that that witness was in fact here today and we didn't play his interview for him where I could cross him.

The trial judge stated, "I understand and I think you can have that opportunity [to recall Lindsey to examine him] as to his statement." With that, Adams's trial counsel stated simply, "Thank you, Your Honor." Adams did not recall Lindsey. Rather, as noted above, defense counsel made strategic use of Lindsey's recorded statements. In his closing argument,

12

defense counsel emphasized that although Lindsey had pled guilty, he had repeatedly refused to implicate Adams.

¶26. On appeal, Adams argues that Lindsey's statement was inadmissible "hearsay" because the State used it as substantive evidence, not to impeach Lindsey's testimony. However, Adams did not make this objection at trial. Rather, Adams only stated that he should be allowed to recall Adams to cross-examine him about his statement, and the trial judge agreed that he could. "It is well established that 'an objection on one or more specific grounds constitutes a waiver of all other grounds.'" *Triplett v. State*, 264 So. 3d 808, 815 (¶25) (Miss. Ct. App. 2018) (quoting *Fleming v. State*, 604 So. 2d 280, 292 (Miss. 1992)), *cert. denied*, 265 So. 3d 180 (Miss. 2019); *accord Reid v. State*, 301 So. 3d 650, 667 (¶75) (Miss. Ct. App. 2019) (holding that defendant waived hearsay objection by objecting on other grounds at trial), *cert. denied*, 302 So. 3d 646 (Miss. 2020). Therefore, Adams's hearsay objection is waived.

¶27. Moreover, it was not plain error to allow the jury to hear Lindsey's interview for essentially the same reasons it was not plain error to allow Lindsey to testify about his guilty plea. Adams's trial counsel made a strategic decision to use parts of Lindsey's interviews, and Adams was not prejudiced as a result. The trial judge was not required to exclude the interviews in the absence of a valid objection to them.

**IV. No error or omission in the indictment requires reversal.**

¶28. Adams argues that his indictment was insufficient because it omitted an essential element of the offense and gave an incorrect date. He also argues that differences between

13

his original indictment and the jury instructions given at trial resulted in an impermissible constructive amendment of the indictment. In addition, he argues that the trial judge's oral rulings granting the State's multiple requests to amend the indictment were ineffective because the trial judge never entered a written order allowing the amendments. We address these issues in turn. Although we agree with Adams that the attempted amendments to the indictment were ineffective, we conclude that the original indictment was sufficient and does not require reversal. We begin by setting out Adams's original indictment and the State's ineffectual efforts to amend it.

¶29.    The grand jury's indictment alleged that Lindsey, Adams, and McAllister

> on or about the 30th of August 2016 . . . , while acting in concert, and/or adding [sic], abetting, assisting, or encouraging each other or others, did then and there unlawfully, willfully and feloniously attempt to take, steal, and carry away from the person of and in the presence of and against the will of Deandres Parker and Alisha Smith certain personal property, to-wit: two Samsung Galaxy cell phones by the exhibition of a deadly weapon, to-wit: a pistol in violation of the provisions of Section 97-3-79 of the Mississippi Code of 1972, Annotated, as amended, which offense is punishable by imprisonment for not less than three (3) years and not exceeding life imprisonment, contrary to the form of the statute in such cases made and provided and against the peace and dignity of the State of Mississippi.

¶30.    On the first day of trial, prior to voir dire, the prosecutor moved to amend the indictment in two respects.[3] First, the prosecutor stated that although an armed robbery can be accomplished by either an attempted taking or an actual taking of property, *see* Miss. Code Ann. § 97-3-79 (Rev. 2020), the State expected that the evidence in this case would prove

---

[3] The prosecutor stated that the State had "filed to amend the indictment" the previous evening and "sent [defense counsel] a copy." However, the trial court's docket does not show, and the record does not include, any written motion to amend the indictment.

14

an actual taking and therefore asked to amend the indictment to state that the defendants did "take or attempt to take" the victims' property. Second, the prosecutor noted that an armed robbery may be committed either "by violence" to the victim's person or by putting the victim "in fear of immediate injury to his person," *id.*, and that the indictment did not specifically allege either alternative. The State asked to amend the indictment to specifically allege the latter. The prosecutor argued that the proposed amendments were matters of form, not substance. Adams's trial counsel objected, arguing that the amendments were substantive. The trial judge stated that he would grant the State's motion because the amendments would "not materially alter the facts" alleged in the indictment and would not "prejudice the defense." The prosecutor stated that he would "provide a written order" based on the judge's ruling. Voir dire then began.

¶31. After the State had rested its case in chief and the jury had left the courtroom, the following exchange took place:

| | |
|---|---|
| Mr. Sparks (Adams's counsel): | Is the motion to amend the indictment read collectively with the indictment? Is it? |
| Mr. Mallette (prosecutor): | It was during voir dire. |
| The Court: | That is why I had it considered yesterday morning. |
| Mr. Mallette: | I have not written an order based on the ruling but when he did it in voir dire he added the language amended. |
| The Court: | I read that to the jury as amended. |
| Mr. Sparks: | I'm asking where is the formal indictment but has that been amended? |

15

| | |
|---|---|
| The Court: | No. |
| Mr. Sparks: | I understand that but is there going to be -- |
| Mr. Mallette: | What I do on indictment, I enter a separate order indicating to what it is amended. I'm misunderstanding your issue. I'm not trying to be evasive, Your Honor. |

Adams's counsel then moved for a directed verdict, arguing that the State had not met its burden. Counsel also pointed out that the indictment alleged that the robbery took place on August 30—when Adams was already in jail. After the State responded, the trial judge stated that he would take the motion under advisement until the next morning. Before court adjourned for the day, the prosecutor stated, "Now that you have pointed out my date's wrong, I have got to amend one of [my jury instructions]."

¶32. The next morning, the trial judge denied Adams's motion for a directed verdict. The State also orally moved to amend the indictment to correct the date. Adams opposed the State's motion, but the trial judge found that the amendment was one of form, not substance, and would not prejudice the defense. The following exchange then occurred:

| | |
|---|---|
| The Court: | . . . [T]he court is going to allow the prosecution to amend the indictment to reflect an accurate date of August 29th. And we will get an order to that effect as to the previous motion amending the indictment. |
| Mr. Mallette: | Can I put them all in one order? |
| . . . . | |
| Mr. Sparks: | . . . [M]y only response to that would be [I] don't mind it being on one order. But I would like for it to be clear that this was two separate times the indictment has been amended with this particular time being after the State |

16

had rested.

The Court: I think you just put it on the record to that effect. So we ruled on the motion to amend the indictment on Wednesday and this is Friday.

Following the charge conference, the defense rested without calling any witnesses, and jury instructions were given that incorporated all previously discussed amendments to the indictment. However, no written order amending the indictment was ever entered.

¶33. After Adams was convicted and sentenced, he filed a motion for a new trial or JNOV in which he reasserted his prior objections to the amendments to his indictment. Adams further argued that the amendments were ineffective because the court still had not entered a written order amending the indictment. After Adams's motion was denied by operation of law, *see* MRCrP 25.3, he filed a notice of appeal. On appeal, he argues that the various attempted amendments to the indictment were ineffective because no written order was entered. He also argues that the original indictment against him was defective.

### A. The amendments to the indictment were ineffective.

¶34. This is not the first appeal to consider the effect of the absence of a written order memorializing an oral ruling allowing an amendment to an indictment. In *Sturgis v. State*, 379 So. 2d 534 (Miss. 1980), Gibson Sturgis was indicted for uttering a forgery. *Id.* at 535. At the close of the State's case-in-chief, the prosecutor moved to amend the indictment to correct the name of the victim (a corporate entity), and Sturgis's attorney objected. *Id.* The trial judge allowed the amendment; however, the court never entered a written order allowing the amendment, "nor was the indictment physically altered to conform to the proposed

17

amendment." *Id.* On appeal, Sturgis conceded that the proposed amendment to the indictment would have been proper. *Id.* (citing Miss. Code Ann. § 99-17-13 (1972)). But Sturgis argued "there was in fact no valid amendment to the indictment" because the trial judge never entered a written order allowing the amendment. *Id.* Sturgis further argued that his conviction had to be reversed because "there was a material variance between the state's evidence and the [original, un-amended] indictment." *Id.*

¶35. The Mississippi Supreme Court noted that "[a]t common law, an indictment once filed could not be withdrawn for amendment." *Id.* at 536. However, the Court further noted that "the Mississippi Legislature has enacted what is now Mississippi Annotated Code section 99-17-15," which permits amendments subject to certain requirements. *Id.* at 536. That statute provides as follows:

> The order of the court for amendment of the indictment . . . shall be entered on the minutes, and shall specify precisely the amendment, and shall be a part of the record of said case, and shall have the same effect as if the indictment or other proceeding were actually changed to conform to the amendment; and wherever necessary or proper for the guidance of the jury, or otherwise, the clerk shall attach to the indictment a copy of the order for amendment.

Miss. Code Ann. § 99-17-15 (Rev. 2020). The Supreme Court concluded that a defendant may waive an objection to the absence of a written order. *Sturgis*, 379 So. 2d at 536-37. The Court stated that "a defendant must specifically bring the absence of an order on the minutes of the court allowing the amendment to the attention of the trial court, or the error will be waived and it may not be raised for the first time on appeal." *Id.* at 537. Because Sturgis had preserved the issue for appeal, the Court addressed the issue on the merits and held that "the attempted amendment to [Sturgis's] indictment . . . was of no effect for the reason that there

18

was no order authorizing the amendment placed on the minutes of the court nor was the amendment made on the face of the indictment." *Id.*[4]

¶36.    In *Reed v. State*, 506 So. 2d 277 (Miss. 1987), Willie Reed was indicted for armed robbery against three victims, each of whom was named in the indictment. *Id.* at 278.  At the close of the evidence, Reed's attorney moved for a directed verdict, arguing that the State had presented no evidence regarding one of the named victims. *Id.*  The trial judge overruled the motion and stated that the indictment could be amended to delete that victim's name. *Id.*  However, the court never entered a written order allowing the amendment. *Id.* at 279.  On appeal, the Supreme Court held that under section 99-17-15, "[t]he State is required to make sure that such an order appears in the record[,] and the defense is required to object to the absence of such order if it wishes to preserve this point for appeal." *Id.* (citing *Sturgis*).  The Court held that "the attempted amendment [was] ineffective" because the State failed to see that a written order authorizing the amendment was entered. *Id.*[5]

¶37.    More recently, in *Leonard v. State*, 972 So. 2d 24 (Miss. Ct. App. 2008), this Court applied the holdings of *Sturgis* and *Reed* to similar facts.  In *Leonard*, Randy Leonard had been indicted for sexual battery. *Id.* at 27 (¶7).  Prior to trial, the State moved to amend the indictment to change the date of the offense from August 13 to August 14. *Id.* at 28 (¶11).

---

[4] The Court nonetheless affirmed Sturgis's conviction, holding that the original indictment was sufficient and that there was no material variance between the original indictment and the proof at trial. *Id.*

[5] The Court nonetheless affirmed Reed's conviction. *Id.* at 280.  The Court reasoned that there was "an adequate factual and legal basis to support the conviction of Reed" for robbing the other two victims, and the Court presumed that the jury found him guilty on that basis "since juries are presumed to follow the instructions given by the trial judge." *Id.*

19

Leonard objected, but the trial judge orally granted the State's motion. *Id.* However, the court never entered a written order allowing the amendment. *Id.* On appeal, this Court recognized that an attempted amendment to an indictment is ineffective unless the trial court enters a written order allowing the amendment. *Id*. at 28-29 (¶¶14-17) (discussing *Reed* and *Sturgis*). This Court further held that the attempted amendment in Leonard's case was ineffective because "the prosecution did not see to it that the circuit court entered an order allowing the amendment of the indictment." *Id.* at 29 (¶17).[6]

¶38. In the present case, the State attempted to amend Adams's indictment in three ways: to correct the date of the crime, to reflect that an actual taking occurred, and to allege that the victims were placed in fear of immediate injury. Although the trial judge orally authorized all three amendments, no written order allowing the amendments was ever entered. Moreover, Adams repeatedly raised the issue in the trial court. Nonetheless, the State apparently forgot to prepare a written order and thus failed to comply with the requirements of section 99-17-15. Put simply, "the prosecution did not see to it that the circuit court entered an order allowing the amendment of the indictment." *Leonard*, 972 So. 2d at 29 (¶17). Accordingly, consistent with the holdings of *Sturgis*, *Reed*, and *Leonard*, the attempted amendments to the indictment were ineffective.

¶39. However, the failure of the attempted amendments does not necessarily mandate the reversal of Adams's conviction. As in *Sturgis*, *Reed*, and *Leonard*, we must determine

---

[6] As in *Sturgis* and *Reed*, this Court held that the failure of the amendment did not require reversal of the conviction. *Id.* at 29 (¶18). The incorrect date did not render the indictment defective, and the variance between the date in the indictment and the date proved at trial was "one of form only." *Id.*

whether the original, un-amended indictment was so flawed that reversal is required. The validity of an indictment is an issue of law that we review de novo. *Forkner v. State*, 277 So. 3d 946, 948-49 (¶9) (Miss. 2019). "[T]he ultimate test, when considering the validity of an indictment on appeal, is whether the defendant was prejudiced in the preparation of his defense." *Id.* (quoting *Colburn v. State*, 201 So. 3d 462, 469 (¶20) (Miss. 2016)). If the indictment "fully notified [the defendant] of the nature and cause of the accusation against him and did not prejudice him in his defense," it is "not defective." *Id.* at 949 (¶11).

### B. The original indictment was legally sufficient, and there was no material variance between it and the proof at trial.

#### 1. "take or attempt to take"

¶40. The armed robbery statute provides that "[e]very person who shall feloniously *take or attempt to take* from the person or from the presence the personal property of another and against his will by violence to his person or by putting such person in fear of immediate injury to his person by the exhibition of a deadly weapon shall be guilty of robbery . . . ." Miss. Code Ann. § 97-3-79 (emphasis added). As noted above, Adams's indictment alleged only that he *attempted* to take Parker and Smith's personal property. Prior to trial, the State sought to amend the indictment to allege, in the disjunctive, that Adams took or attempted to take the property. The evidence presented at trial showed that the taking actually occurred—the victims' cell phones were taken from them. The jury was then instructed, in relevant part, that they could find Adams guilty of armed robbery only if they found, beyond a reasonable doubt, that he did "take or attempt to take" the victims' property. On appeal, Adams argues that the variance between the indictment's allegation (that he attempted to take

21

the victims' property) and the jury instruction (that he took or attempted to take their property) was material and requires reversal.

¶41.    We conclude that this variance does not require reversal.  In *Morton v. State*, 246 So. 3d 895, 904 (¶¶22-24) (Miss. Ct. App. 2017), *cert. denied*, 246 So. 3d 886 (Miss. 2018), we rejected a similar argument.  In *Morton*, the defendant argued that his conviction for armed robbery should be reversed because his indictment alleged that he actually took the victims' property, but the jury instructions required the jury to find that he only attempted to take the property.  *Id.* at (¶22).  We reasoned that the armed robbery statute covers "both an attempt to take and an actual taking of another person's property."  *Id.* at (¶24) (quoting *Houston v. State*, 811 So. 2d 371, 372 (¶4) (Miss. Ct. App. 2001)); *see also White v. State*, 969 So. 2d 72, 82 (¶38) (Miss. Ct. App. 2007) ("[A]ccording to the statute, the crime of armed robbery is complete at the attempt." (quotation marks omitted)).  Therefore, the defendant "was guilty [armed] robbery" regardless of whether "the jury found that [he] actually took the property" or only "attempted to take the property."  *Morton*, 246 So. 3d at 904 (¶24).  For that reason, we held that "the variance between the indictment and the jury instructions did not substantially alter the elements of proof necessary for a conviction of armed robbery."  *Id*.  In addition, the variance did not "prejudice[] [the defendant] in his defense."  *Id.*  Accordingly, the variance was "immaterial" and not grounds for reversal.  *Id.*  The same analysis applies to Adams's argument in this case.

> **2.    "by putting . . . Smith or . . . Parker in fear of immediate injury"**

¶42.    A robbery is elevated to an armed robbery if it is accomplished "by violence to [the

22

victim's] person or by putting such person in fear of immediate injury to his person by the exhibition of a deadly weapon." Miss. Code Ann. § 97-3-79. As discussed above, Adams's indictment alleged that the defendants exhibited a deadly weapon, but it did not specifically allege that the defendants took the victims' property by violence or by putting them in fear of immediate injury. At trial, the jury was instructed that it could find Adams guilty if he and his codefendants put the victims "in fear of immediate injury by the exhibition of a deadly weapon, to wit: a pistol." Adams argues that his original indictment was fatally defective because it omitted an element of the offense and that the jury instructions constructively amended the indictment by supplying the missing element.

¶43. Rule 7.06 of the Uniform Rules of Circuit and County Court Practice, which was in effect when Adams was indicted, governs Adams's indictment. *Forkner*, 277 So. 3d at 949 (¶10).[7] Rule 7.06 provided in part:

> The indictment upon which the defendant is to be tried shall be a plain, concise and definite written statement of the essential facts constituting the offense charged and shall fully notify the defendant of the nature and cause of the accusation. Formal and technical words are not necessary in an indictment, if the offense can be substantially described without them. An indictment shall also include the following:
>
> 1.      The name of the accused;
>
> 2.      The date on which the indictment was filed in court;
>
> 3.      A statement that the prosecution is brought in the name and by authority of the State of Mississippi;

---

[7] Adams was indicted on February 23, 2017, prior to the adoption of the new Mississippi Rules of Criminal Procedure. "URCCC 7.06 has since been supplanted by Rule 14.1 of the Mississippi Rules of Criminal Procedure, which became effective on July 1, 2017." *Forkner*, 277 So. 3d at 949 n.3.

4.    The county and judicial district in which the indictment is brought;

5.    The date and, if applicable, the time at which the offense was alleged to have been committed. Failure to state the correct date shall not render the indictment insufficient;

6.    The signature of the foreman of the grand jury issuing it; and

7.    The words "against the peace and dignity of the state."

URCCC 7.06 (replaced effective July 1, 2017).

¶44.    Here, the indictment clearly notified Adams that he was being charged with armed robbery and provided "a plain, concise and definite written statement of the essential facts constituting the offense charged." *Id.* The heading of the indictment listed the charge as "ROBBERY WITH A DEADLY WEAPON" and cited the armed robbery statute. In addition, the indictment specifically alleged that the defendants committed the robbery "by the exhibition of a deadly weapon," which is the critical distinction between armed robbery and simple robbery. *Compare* Miss. Code Ann. § 97-3-79, *with* Miss. Code Ann. § 97-3-73 (Rev. 2020). Finally, the indictment charged that the defendants committed the robbery "in violation of the provisions of Section 97-3-79 of the Mississippi Code" and "contrary to the form of the statute in such cases made and provided." In *Forkner*, the Supreme Court held that the indictment in that case "was not defective" in part because it "informed [the defendant] that his offense was 'contrary to the form of the statute' and directed him to [the applicable Code section]." *Forkner*, 277 So. 3d at 949 (¶11). Under the circumstances of this case, we likewise conclude that Adams's "indictment was not defective; instead, it fully notified him of the nature and cause of the accusation against him and did not prejudice him

24

in his defense." *Id.*

¶45. Although Adams's indictment did not specifically allege that the robbery was done by force or fear, we conclude that this omission was of no moment in this case. The State was not required to choose between those two alternatives in the indictment. *See Azomani v. State*, 222 So. 3d 343, 350-51 (¶20) (Miss. Ct. App. 2016), *aff'd*, 222 So. 3d 282 (Miss. 2017). That is, the State could have indicted Adams for both alternatives in the disjunctive, and at trial the jury could have convicted him of either. *See id.* As a practical matter, such an indictment would have provided Adams with no greater notice or specificity than the indictment in this case, which charged that the robbery was done "contrary to the form of the statute." *See Forkner*, 277 So. 3d at 949 (¶11). Nor does Adams articulate any way in which his defense was prejudiced by the indictment's language. Accordingly, we conclude that Adams's indictment complied with the then-operative rule by providing "a plain, concise and definite written statement of the essential facts constituting the offense charged and . . . fully notify[ing] [Adams] of the nature and cause of the accusation." URCCC 7.06 (replaced effective July 1, 2017).

### 3.     date of the offense

¶46. Adams's indictment alleged that he committed the armed robbery "on or about" August 30, but the proof at trial showed that the robbery took place around 10:27 p.m. on August 29. Adams argues that this variance between the indictment and the proof at trial requires us to reverse his conviction.

¶47. This argument is without merit. To begin with, there was no actual "variance"

25

between the indictment and the proof. "The prosecution, as a consequence of the use of the 'on or about' designation, was not required to prove the exact date; it suffices if a date reasonably near is established." *United States v. Grapp*, 653 F.2d 189, 195 (5th Cir. Unit A Aug. 1981). The State proved that Adams committed the crime "on or about" August 30 by proving that he committed the crime sometime after 10 p.m. on August 29. Moreover, former Rule 7.06 stated that the indictment should include the date of the offense, but the rule also specifically stated that the "[f]ailure to state the correct date shall not render the indictment insufficient." URCCC 7.06(5) (replaced effective July 1, 2017); *accord* Miss. Code Ann. § 99-7-5 (Rev. 2020). In this case, the indictment's reference to August 30 rather than August 29 was a matter of form, not substance, and did not prejudice Adams in any manner. *See Leonard*, 972 So. 2d at 29 (¶18). Accordingly, this alleged variance is not grounds for reversal.

\* \* \* \* \*

¶48. In summary, the State's attempted amendments to the original indictment—to allege an actual taking, to allege specifically that the robbery was accomplished by fear, and to alter the date of the offense—were ineffective because the State failed to see to it that the trial court entered a written order allowing the amendments. However, the original indictment returned by the grand jury was not fatally defective. Nor was there any material variance between the original indictment and the proof at trial. Accordingly, Adams's various challenges to his indictment are without merit.

## V. No cumulative error occurred.

¶49. Finally, Adams argues that he is entitled to a new trial based on "cumulative error." Under the cumulative error doctrine, "reversible error" may be established when "the cumulative effect of all errors deprives the defendant of a fundamentally fair trial." *Ross v. State*, 954 So. 2d 968, 1018 (¶138) (Miss. 2007). However, Adams has established only one error—the failure to enter a written order allowing amendments to his indictment. As discussed above, that error was harmless because Adams's original, un-amended indictment was legally sufficient and supports the conviction. Accordingly, Adams is not entitled to a new trial based on "cumulative error." *See Batiste v. State*, 121 So. 3d 808, 873 (¶184) (Miss. 2013) ("Because only a single error occurred, there are no errors that could combine with other errors to establish cumulative error.").

## CONCLUSION

¶50. The jury's verdict is not contrary to the overwhelming weight of the evidence, and the trial judge did not commit any "plain error" by allowing Lindsey to testify about his guilty plea or by allowing the jury to hear Lindsey's recorded statements to police. In addition, although Adams's original indictment was never properly amended, no defect or omission in the original indictment requires reversal. Accordingly, Adams's conviction and sentence are **AFFIRMED**.

**BARNES, C.J., CARLTON, P.J., GREENLEE, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. WESTBROOKS, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**